737 F.2d 1513
 FEDERAL DEPOSIT INSURANCE CORP., Plaintiff-Appellee,
v.
GULF LIFE INSURANCE COMPANY, a Corporation, Defendant and
Third-Party Plaintiff-Appellant, Cross-Appellee,
Vonna Jo Gregory, Third-Party Defendant, Cross-Appellant.
 No. 82-7173.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 1, 1984.
 
 Albert P. Brewer, Decatur, Ala., for Gulf Life.
 Richard A. Lawrence, Montgomery, Ala., for Gregory, third-party defendant, cross-appellant.
 Charles M. Crook, Montgomery, Ala., for plaintiff-appellee.
 Appeals from the United States District Court for the Middle District of Alabama.
 Before TJOFLAT and VANCE, Circuit Judges, and MORGAN, Senior Circuit Judge.
 VANCE, Circuit Judge:
 
 
 1
 Gulf Life Insurance Company (Gulf Life), the defendant below, appeals a judgment in favor of the Federal Deposit Insurance Corporation (FDIC) for $81,289.89 plus costs. Vonna Jo Gregory, the third party defendant below, appeals a judgment in favor of Gulf Life for $36,349.64 plus costs. Finding no reversible error, we affirm the judgment of the district court on both claims.
 
 
 2
 In 1975 Gulf Life issued two group creditor life insurance policies, one to First Bank of Macon County (Macon) and one to Bank of Camden, which later became Wilcox County Bank (Wilcox). In all pertinent respects the two policies are identical. Under the policies Gulf Life agreed to insure the lives and health of certain installment loan debtors of the banks, with the lending bank named as the primary beneficiary. The banks paid Gulf Life the premiums for the eligible debtors electing to purchase the insurance, using funds collected from the insured debtors. In practice Gulf Life received only 35% of the collected premiums, with the remaining 65% distributed initially among several bank officers and employees involved in selling insurance to the banks' debtors and, after 1976, among the banks' stockholders.
 
 
 3
 Each group creditor policy, together with riders, contains two provisions for refunding premiums to any debtor in the event his debt is terminated before all premiums paid are exhausted. These unearned premium refund clauses read as follows:
 
 
 4
 REFUND PROVISION--If all or any part of the indebtedness is terminated prior to the end of the period for which the insured debtor has contributed premium, the Company [Gulf Life] shall promptly refund or credit an amount equal to the amount computed by the "sum of digits" formula (Rule of 78). Such refund will be promptly credited or paid by the Creditor to the person entitled thereto.
 
 
 5
 DEBTOR'S CONTRIBUTION ....
 
 
 6
 If all or any part of the indebtedness is terminated prior to its originally scheduled maturity date, the Company [Gulf Life] shall promptly refund to the debtor an amount equal to the amount, if any, computed by the "sum of digits" formula, commonly known as the "Rule of 78" for decreasing insurance ....
 
 
 7
 Wilcox and Macon eventually fell on hard times, and in early 1978 FDIC was appointed receiver of the two banks. FDIC as receiver entered purchase and assumption agreements with Town-Country National Bank and First Alabama Bank (FAB). Town-Country and FAB agreed therein to reopen Wilcox and Macon, respectively, after purchasing their acceptable assets and assuming their deposit liabilities. To facilitate the consummation of the purchase and assumption agreements, FDIC in its corporate capacity purchased from FDIC as receiver certain assets of the failed banks that were unacceptable to the assuming banks. 12 U.S.C. Sec. 1823(e) (current version codified at 12 U.S.C. Sec. 1823(c)). By arranging the purchase and assumption agreements FDIC was able to avoid the interruption of banking services and potential loss to depositors that liquidation would have entailed. See generally FDIC v. Merchants National Bank, 725 F.2d 634, 637-39 (11th Cir.1984); Gunter v. Hutcheson, 674 F.2d 862, 865-66 (11th Cir.), cert. denied, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982) (detailing the procedures involved in a purchase and assumption transaction). Among the assets sold to FDIC in its corporate capacity were the two group creditor policies issued by Gulf Life.
 
 
 8
 FDIC, in its corporate capacity,[1] brought suit against Gulf Life seeking 100% of the amount of unearned premiums due the failed banks' debtors on approximately three hundred prematurely terminated loans. Gulf Life countered that it is responsible for only the 35% of the refunds it has already returned, since it received only 35% of the premiums initially. The insurer disclaimed liability for the remaining 65% of the premiums paid by the banks to the banks' own agents. The trial court held Gulf Life liable for 100% of the refunds and, after disallowing FDIC's claims concerning some of the individual refunds, entered judgment for FDIC.
 
 I. SECTION 1823(e)
 
 9
 Gulf Life's defense is crafted in the form of a syllogism: FDIC is entitled to the remaining 65% of the unearned premium refunds only if the failed banks would have been so entitled; the failed banks would not have been so entitled; therefore, FDIC is not so entitled. Gulf Life devotes most of its argument to demonstrating that the failed banks could not have recovered the disputed amounts under Alabama law, relying on theories of account stated, account settled, accord and satisfaction, estoppel, waiver, and unjust enrichment. We need not decide the merits of Gulf Life's minor premise, however, because the error of its major premise requires that we reject the syllogism's conclusion.
 
 
 10
 The assets that the FDIC receives through its participation in a purchase and assumption transaction are protected from certain challenges by 12 U.S.C. Sec. 1823(e):
 
 
 11
 No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.
 
 
 12
 Gulf Life presented no documents meeting the strict requirements of section 1823(e) to show that its refund obligation extends only to 35% of the unearned premiums. This deficiency in the evidence disposes of Gulf Life's arguments grounded in account stated, account settled, and accord and satisfaction. The two quoted provisions of the policies clearly place on Gulf Life the ultimate responsibility for paying all unearned premium refunds. In the absence of any evidence of a contrary agreement permissible under section 1823(e), FDIC was entitled to rely on the unequivocal language of the policies, notwithstanding any stated or settled account existing as a matter of circumstance or oral accord and satisfaction that may have existed between Gulf Life and the failed banks. FDIC v. Hoover-Morris Enterprises, 642 F.2d 785, 787 (5th Cir. Unit B 1981); see also Merchants National Bank, supra; FDIC v. Lattimore Land Corp., 656 F.2d 139 (5th Cir. Unit B 1981); Chatham Ventures, Inc. v. FDIC, 651 F.2d 355 (5th Cir. Unit B 1981), cert. denied, 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1982).
 
 II. FEDERAL COMMON LAW
 
 13
 Section 1823(e) by its terms protects the FDIC only from "agreement[s]" not satisfying the section's requirements. Because Gulf Life's theories of waiver, estoppel, and unjust enrichment are not doctrines based on the parties' mutual assent, section 1823(e) is inapplicable to these defenses.
 
 
 14
 This court recently faced a similar situation in Gunter v. Hutcheson, 674 F.2d 862 (11th Cir.), cert. denied, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). The plaintiffs in Gunter took out a loan with a bank and executed a promissory note. They used the funds to purchase a controlling interest in a second bank, which failed. The lending bank in the interim also failed, and the FDIC in its corporate capacity became the holder of the note in the course of a purchase and assumption transaction. The plaintiffs sued the FDIC for rescission, claiming that their purchase of the stock and consequent execution of the note were induced by the lending bank's fraudulent misrepresentations concerning the note and the financial health of the second bank. The FDIC counterclaimed for payment on the note.
 
 
 15
 The Gunter court, relying on United States v. Kimbell Foods, Inc., 440 U.S. 715, 726-27, 99 S.Ct. 1448, 1457-1458, 59 L.Ed.2d 711 (1979), and D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), first concluded that federal law governed the plaintiffs' fraud claim because the controversy implicated the rights and obligations of the FDIC. 674 F.2d at 868-69. The court next analyzed and weighed the factors elucidated in Kimbell Foods to determine whether state law should be employed to give content to the federal law or whether a nationally uniform federal rule was appropriate. See id. at 869-72. Concluding that application of the Kimbell Foods factors dictated a uniform federal rule governing the FDIC's exposure to fraud claims, the court fashioned a complete defense to such claims for the FDIC when it acquires a note pursuant to a purchase and assumption agreement for value, in good faith, and without actual knowledge of the fraud. Id. at 872-73. We follow the analytical path travelled by the Gunter court and arrive at the conclusion that a uniform federal rule paralleling that forged in Gunter governs Gulf Life's contentions concerning estoppel, waiver, and unjust enrichment.
 
 
 16
 Gunter dictates that federal law govern this case because the rights and obligations of the FDIC are at stake. The considerations identified by the Supreme Court in Kimbell Foods as being pertinent in deciding whether state law should form the content of that federal law are: first, whether the federal program by its nature requires national consistency; second, whether state law would frustrate specific goals of the federal program; and third, the extent to which a uniform federal rule would upset state-based commercial relations. 440 U.S. at 728-29, 99 S.Ct. at 1458-1459. The Gunter court found the first two of these factors to favor strongly a uniform federal rule protecting the FDIC from fraud claims. We conclude that the reasoning of that discussion applies with equal force to claims of estoppel, waiver, and unjust enrichment.
 
 
 17
 First, requiring the FDIC to consider the law of each state for these defenses would impede the FDIC's ability to select quickly between its liquidation and purchase and assumption alternatives, which suggests that by its nature this federal program demands national uniformity. Cf. Gunter, 674 F.2d at 869 ("decisions concerning the appropriate method of dealing with a bank failure must be made with extraordinary speed if the going concern value of the failed institution is to be preserved"). The second consideration, related to the first, is that because these defenses are not apparent from the records of the failed banks, exposing the FDIC to them would undermine its ability to form with dispatch, if at all, a considered opinion that entering a purchase and assumption agreement and buying unacceptable assets will better protect the FDIC from loss than a liquidation of the failed banks, as required under 12 U.S.C. Sec. 1823(c)(4)(A).[2]
 
 
 18
 Were the FDIC subject to these defenses it would have to pursue one of two unpalatable courses. First, it could conduct its evaluations of the failed banks' assets with its current speed and detail, but be unable to make the informed judgment that is a statutory prerequisite to its participation in a purchase and assumption agreement, due to the possible existence of unknown claims to which it nonetheless would be vulnerable. Second, it could evaluate the assets much more slowly and exhaustively, probing beyond the bank's records to the extent possible, at the risk of losing the going concern value of the failed bank and the public confidence that it reflects. Even then, the FDIC might not be able to form the necessary opinion. Under either branch of this Hobson's choice the FDIC's ability to enter purchase and assumption agreements would be seriously circumscribed. This in turn would frustrate the overriding policy of promoting stability and confidence with respect to the nation's banking system. See Gunter, 674 F.2d at 869-70.
 
 
 19
 As in Gunter, the third Kimbell Foods factor points toward employing state law as the federal rule of decision, but not with sufficient force to overcome the pull of the first two considerations. The Gunter court noted that the alleged adverse effect of a uniform protective rule on settled commercial expectations grounded in state law was largely illusory because the FDIC would carry a shield no greater than that possessed by a holder in due course--a much more likely transferee than the FDIC. See id. at 872. The asset involved in the present case, however, is not a negotiable instrument, which strengthens the effect of the third Kimbell factor.
 
 
 20
 Gunter 's comparison of the FDIC to a holder in due course is nevertheless apt. In the majority of cases in this circuit in which the obligor has sought to avoid payment to the FDIC, the obligation has been embodied in a note. See, e.g., id. at 866; Lattimore Land Corp., 656 F.2d at 140; Chatham Ventures, 651 F.2d at 357; FDIC v. Dye, 642 F.2d 837, 839-40 (5th Cir. Unit B 1981); Hoover-Morris Enterprises, 642 F.2d at 786-87; Black v. FDIC, 640 F.2d 699, 700 (5th Cir. Unit B), cert. denied, 454 U.S. 838, 102 S.Ct. 143, 70 L.Ed.2d 119 (1981). In the common situation where a note is a negotiable instrument, estoppel, waiver, and unjust enrichment are defenses to which a holder in due course would be impregnable. See U.C.C. Sec. 3-305(2). Gunter 's analysis thus persuades us that in the majority of cases little dashing of commercial expectations would result from a uniform federal rule protecting the FDIC from such defenses. To the extent that the third factor militates in favor of adopting state law, it is overcome by the counterweight of the first two considerations. As the Supreme Court acknowledged in Kimbell Foods, "[o]f course, formulating special rules [favoring the federal agency] would be justified if necessary to vindicate important national interests." 440 U.S. at 740, 99 S.Ct. at 1464. Such interests unquestionably include public confidence in the stability of the banking system.
 
 
 21
 We turn now to the task of fashioning the proper federal rule. Any uniform rule of federal common law available to protect the FDIC should be constructed with reference to the reasons necessitating a uniform rule initially. As we have noted, the primary reason for such a rule is to allow the FDIC to reach a considered opinion that a purchase and assumption transaction will better protect the FDIC from loss than a liquidation. To the extent the FDIC knows of a defense, its ability to form this judgment is unimpaired. Thus, if the FDIC[3] actually knows of any estoppel, waiver, or unjust enrichment defense at the time it enters the purchase and assumption transaction, it is subject to the defense. See Gunter, 674 F.2d at 873. Compare Merchants National Bank, 725 F.2d at 640 (FDIC's knowledge immaterial under section 1823(e)). Second, since the FDIC's judgment centers on the possibility of loss to the FDIC from its inability to collect on the asset, the FDIC must have given value for the asset. See Gunter, 674 F.2d at 873. Finally, the FDIC must have received the asset "in a good-faith execution of its part of the purchase and assumption transaction." Id.
 
 
 22
 In sum, when the FDIC in its corporate capacity obtains an asset in the course of a purchase and assumption transaction, for value, in good faith, and without knowledge of the defenses, its rights in the asset are not limited by the defenses of waiver, estoppel, or unjust enrichment. Gulf Life has not contended that FDIC failed to meet any of the requirements of this rule. Thus, we hold that FDIC's claim against Gulf Life for the unearned premium refunds is not vulnerable to these defenses.[4]III. LOANS TRANSFERRED TO FIRST ALABAMA BANK
 
 
 23
 Gulf Life raises one final argument in an effort to salvage a subset of the unearned premium refunds. One group of refunds corresponds to loans that were transferred to FAB as part of the purchase and assumption agreement through which FAB became the assuming bank for Macon. In conjunction with the purchase and assumption transaction, FDIC and FAB executed an indemnity agreement for the protection of FAB. When the borrowers on these loans became entitled to unearned premium refunds, FAB paid the claims and looked to FDIC, by virtue of the indemnity agreement, for reimbursement.
 
 
 24
 Gulf Life contends, without elaboration or support, that FDIC's failure to prove that it has honored FAB's request for reimbursement is a "fatal omission." We disagree. The pertinent policy provisions, as quoted above, differ somewhat, but under neither must FDIC establish its payment of refunds as a prerequisite to obtaining payment from Gulf Life. The provision entitled "Debtor's Contribution" anticipates that Gulf Life will pay refunds directly to the debtor and does not address the procedure to be followed when Gulf Life fails to do so. Under the rider clause entitled "Refund Provision," Gulf Life is to make refunds to the person entitled thereto, an arrangement that clearly contemplates that Gulf Life will make the initial payment.[5] We therefore agree that FDIC was not initially obliged to reimburse FAB before demanding payment from Gulf Life.
 
 IV. THE THIRD PARTY CLAIM
 
 25
 In conjunction with its group creditor policy issued to Macon, Gulf Life entered into agreements with several persons, under which these individuals were paid commissions out of the premiums collected from the insured debtors in exchange for their efforts in insuring the debtors. These agreements contained the following provision:
 
 
 26
 Any overpayment of commissions or service fees hereunder due to a refund of premiums ... will be refunded to the Company [Gulf Life] on request.
 
 
 27
 Gulf Life brought a third party claim against Vonna Jo Gregory, one of these individuals, for a refund based on this agreement in the event Gulf Life was held liable for 100% of the unearned premium refunds. The trial court entered judgment in favor of Gulf Life on this claim.
 
 
 28
 Gregory on appeal does not dispute that the commission agreement obligates her to refund the commissions she received for insurance coverage on which unearned premium refunds became due. She contends, however, that the debt to Gulf Life was discharged in bankruptcy and that the trial court erroneously rejected this affirmative defense. Upon "advis[ing] the Court" via allegations in her answer that she "[was] in a Chapter XII [sic] proceeding," she claims, the burden fell on Gulf Life to prove that its debt fell within an exception to a discharge that she now alleges resulted from the bankruptcy proceedings.
 
 
 29
 It is true that the creditor normally carries the burden of showing such an exception. In re Cross, 666 F.2d 873, 880 (5th Cir. Unit B 1982). It is clear from the record, however, that Gregory did not attempt to introduce into evidence an order of discharge or any other proof of discharge. Thus, the burden never fell on Gulf Life to show an exception to the discharge. See Kreitlein v. Ferger, 238 U.S. 21, 26, 35 S.Ct. 685, 686, 59 L.Ed. 1184 (1915); United States v. Syros, 254 F.Supp. 195, 198 (E.D.Mo.1966).
 
 V. CONCLUSION
 
 30
 To summarize our holdings in this case, Gulf Life's arguments of account stated, account settled, and accord and satisfaction are defeated by 12 U.S.C. Sec. 1823(e); its challenges based on estoppel, waiver, unjust enrichment, and termination for default by federal common law; and its contentions regarding the FAB loans by the language of its policy with Macon. Vonna Jo Gregory's appeal fails for lack of proof in the district court.
 
 
 31
 AFFIRMED.
 
 
 
 [1]
 See 12 U.S.C. Sec. 1819 (Fourth); FDIC v. Sumner Financial Corp., 602 F.2d 670 (5th Cir.1979)
 
 
 [2]
 Section 1823(c)(4)(A) provides that "[n]o assistance shall be provided under this subsection [permitting the FDIC to purchase assets of a failed bank in order to facilitate a purchase and assumption by a second bank] in an amount in excess of that amount which the Corporation determines to be reasonably necessary to save the cost of liquidating [the failed bank]," unless the FDIC concludes that continuation of the failed banks' services is necessary to maintain adequate local banking services. The provision in effect during the events of this case limited the FDIC's discretion to instances when "in the judgment of the Board of Directors such action will reduce the risk or avert a threatened loss to the Corporation..." 12 U.S.C. Sec. 1823(e) (current version codified at 12 U.S.C. Sec. 1823(c)(4)(A)). The current provision "essentially restates, though more specifically, the old requirement for undertaking the transaction..." Merchants National Bank, 725 F.2d at 638 n. 1
 
 
 [3]
 It is not necessary under the facts of this case for us to decide whether FDIC's closed bank division is charged with knowledge of defenses known only to FDIC's open bank examiners
 
 
 [4]
 Some of the refunds resulted from pre-receivership cancellation of coverage because the debtors fell into default on their loan repayments, even though default is not listed in the group creditor policies as a ground for terminating insurance. Gulf Life contends that these terminations were wrongfully made by agents of the failed banks, and that Gulf Life reasonably relied on monthly reports prepared by these agents, which did not list the cause for each termination of coverage requiring a premium refund. Gulf Life claims that it thus reasonably believed the cancellations were for legitimate reasons and that its remittance of 35% of the refund due upon these terminations does not, as the trial court held, establish an implied contract to allow default as a ground of cancellation
 Once more, Gulf Life's argument depends on the erroneous premise that FDIC stands in no better position than the banks with which Gulf Life dealt. Our discussion of federal common law fully applies here, however, and we thus reject Gulf Life's defense.
 
 
 [5]
 Gulf Life also contends that the trial court erroneously construed the indemnity agreement as encompassing claims for unearned premium refunds. Gulf Life has never suggested why this interpretation is incorrect, and we are unwilling to characterize it as erroneous