**In re Bobby G. HOWARD and Peggy Howard, Debtors.**

**Bankruptcy No. 7–85–00180.**

United States Bankruptcy Court, W.D. Texas, Midland/Odessa Division.

Sept. 8, 1986.

John C. Steinberger, Kerr, Fitz-Gerald & Kerr, Midland, Tex., for debtors.

Millard O. Anderson, House Counsel, Midland, Tex., for Federal Deposit Ins. Corp.

## MEMORANDUM OPINION

JOSEPH C. ELLIOTT, Chief Judge.

The major issue confronting the Court in this Chapter 7 case is whether a debtor, who has claimed a Texas homestead exemption under 11 U.S.C. § 522, may avoid a lien asserted by the Federal Deposit Insurance Corporation on that homestead, on the grounds that the lien is invalid under the Texas homestead laws.

## FACTS

The Howards' case is before the Court on the Debtors' Motion to Avoid Liens, which was heard on May 1, 1986. The relevant facts, either stipulated to by the parties or

determined from the evidence adduced at the hearing, the Court finds as follows.

The transactions relevant to this case are complex and cover an extended period of time. The Federal Deposit Insurance Corporation (the "FDIC") asserts a claim of $770,000, that it contends is secured by a valid lien on 460.61 acres belonging to the Howards. The 460.61 acres includes 194.71 acres which the Howards claim is their rural homestead and therefore, they assert, the lien is invalid as to the 194.71 acres.

On January 27, 1983, the Howards executed a Correction Deed of Trust in favor of the First National Bank of Midland. The Correction Deed states that it secures "that certain promissory note of even date herewith in the original principal sum of $770,000" and further states that it and the underlying promissory note "are given in renewal, extension and modification ... of the following described Deeds of Trust and their underlying promissory notes [payable to]: (a) Eureka Life Insurance Company [,] (b) Farmers Home Administration [, and] (c) First National Bank of Midland, Texas."

The nature and origin of the indebtedness and the lien securing it, referred to in the Correction Deed, can be broken down as follows:

(a) *The Eureka Life Insurance Co. debt.* It is undisputed this was a purchase money loan by Eureka to the Howards, in the original amount of $122,000.00, made on November 21, 1977 and eventually (on October 6, 1981) transferred to the First National Bank of Midland.

The parties have stipulated that the records of the FDIC show a balance of $64,141.28 in principal plus $36,119.33 in accrued interest due and owing on this obligation as of January 15, 1986. The Debtors also introduced evidence, unchallenged by the FDIC, that the balance of the loan, on the date it was transferred to the First National Bank of Midland, was $64,141.28.

(b) *The FHA debt.* It is also undisputed this was a purchase money obligation, in the original amount of $82,000.00, incurred by the Howards on November 21, 1977.

The Debtors at the hearing introduced a written Release of the Deed of Trust securing this debt, executed by the FHA on July 21, 1981 and recorded on July 22, 1981, which Release recites that it was given in exchange for full payment of the $82,000 debt.

It is stipulated that the FDIC records show a balance of $22,530.27 in principal plus $13,390.07 in accrued interest on this obligation as of January 15, 1986.

No evidence was presented of the manner and time of acquisition of this debt and lien by the First National Bank of Midland. The Court notes that the Correction Deed was executed more than a year after the Release was recorded.

(c) *The First National Bank of Midland debt.* This debt is the result of two distinct transactions.

$18,300.00 of the debt was incurred by the Howards on November 21, 1978 in order to make a payment on the Eureka purchase money loan, and was in fact used for that purpose. It is undisputed this portion thus assumes the character of the Eureka obligation, that of a purchase money loan.

The remainder of the FNBM debt is undisputedly not the result of a purchase money loan. The loan, in the original amount of $493,934.78, was made by the First National Bank of Midland to the Howards on or about December 31, 1981.

The present balances of these two loans are not in evidence.

All of the underlying Deeds of Trust and the Correction Deed were properly recorded. The Correction Deed, a printed form prepared by the First National Bank of Midland, contains a representation and warranty by the grantors (the Howards) that the indebtedness described therein "is secured by a valid lien on the aforesaid [all 460.61 acres] property."

None of the documents reflect any designation of homestead by the Howards, and the Bank never requested one. On July 2, 1985, the Howards executed and recorded a Designation of Homestead, and claim therein 200 acres, consisting of a 5.29 acre tract and the 194.71 acre tract in issue here. It is undisputed that the 5.29 acres on which the Howards reside is and always has been their homestead, that this property is not included in the 460.61 acres referred to in the Correction Deed and is separated from the 194.71 acres also claimed as homestead. It is also undisputed that the Howards have been, at all relevant times, openly and continuously farming the 194.71 acres.

On or about October 14, 1983, the First National Bank of Midland was declared insolvent and the acting Comptroller of the Currency appointed the FDIC Receiver of the failed bank pursuant to 12 U.S.C. §§ 191 and 1821.

The FDIC as Receiver then entered into a Purchase and Assumption transaction whereby it sold certain assets and transferred certain liabilities to Republic Bank First National Midland, pursuant to 12 U.S.C. § 1823(c)(2)(A). Certain assets not sold to RepublicBank First National Midland were sold to the FDIC in its corporate capacity.

An Order approving the sale of assets and transfer of liabilities was entered in Cause No. MO 83–CA–174 in the United States District Court for the Western District of Texas.

Among the assets sold to the FDIC in its corporate capacity were the Note and Deed of Trust made the subject of this complaint.

The FDIC in its corporate capacity gave value for the Note and Deed of Trust in question.

The record in the case shows that on July 11, 1985, the Howards filed Chapter 7 and in their Schedules have claimed 200 acres, including the 194.71 acres covered by the Correction Deed, as exempt under the laws of the State of Texas. No objections to this exemption have been filed. On November 14, 1985, the Howards filed their Motion to Avoid Liens. The Motion was heard on May 1, 1986 and the Court took the matter under advisement to consider the evidence and briefs filed by the parties.

## DISCUSSION AND CONCLUSIONS OF LAW

### Does State or Federal Law Apply?

The Howards contend that the lien granted in the Correction Deed of Trust held by the FDIC is invalid as to that portion attributable to the note to the First National Bank of Midland in the original principal amount of $493,934.78. The homestead laws of Texas clearly support this argument.

The Texas Constitution provides, in pertinent part:

Sec. 50. The homestead of a family, or of a single adult person shall be, and is hereby protected from forced sale for payment of all debts except for the purchase money thereof, or a part of such purchase money, the taxes due thereon, or for work and material used in constructing improvements thereon ... No mortgage, trust deed, or other lien on the homestead shall ever be valid, except for the purchase money therefor, or improvements made thereon, as hereinbefore provided ...

Tex. Const. art XVI, § 50.

A homestead may consist of "one or more parcels of real property, including improvements, that is not in a city, town or village and that totals not more than 200 acres for a family." Tex.Prop.Code Ann. § 41.001 (Vernon 1984). The parcels comprising a rural homestead need not be contiguous, or connected to the tract upon which the dwelling place is situated. *Rancho Oil Co. v. Powell*, 142 Tex. 63, 175 S.W.2d 960 (1943). No written designation of homestead is required. *See* Tex.Prop. Code Ann. § 41.022 (Vernon 1984) (claimant "may voluntarily designate" rural homestead).

■ In the instant case, it is stipulated that the $493,934.78 obligation to the Bank is not for purchase money, taxes or improvements and the Howards claim no more than 200 acres as their homestead. That they claim more than one parcel and did not designate their homestead until after the Deed was executed does not, under Texas law, affect their homestead claim. Clearly, to the extent it secures the $493,934.78 note to the Bank, the lien would be invalid as to the 194.71 acres claimed as homestead, if the lien were still in the hands of the Bank and Texas law applied. The FDIC argues, however, that the result should be different because it, not the Bank, is now the holder of the lien.

The FDIC is a successor in interest to the First National Bank of Midland, by virtue of its having purchased the Correction Deed of Trust and the underlying note under a Purchase and Assumption Agreement authorized under 12 U.S.C. § 1823. As a general rule, when a party becomes a successor in interest through legal process, that party's interest is subject to whatever defense the obligor has against its predecessor in interest. *Charter Executive Center Ltd. v. Federal Deposit Insurance Corp. (In re Charter Executive Center Ltd.)*, 34 B.R. 131, 134 (Bankr.M.D.Fla. 1983).

■ However, in the instant case the FDIC is a party to the suit in its capacity as corporate insurer of the Bank. *See Gunter v. Hutcheson*, 674 F.2d 862 (11th Cir.), *cert. denied* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982) (for a comprehensive discussion of the distinctive roles of the FDIC as receiver and as corporate insurer) [hereinafter cited as *Gunter*]. The FDIC as corporate insurer takes on greater rights than those of its predecessor, the Bank. *See Jeter v. Seminole State National Bank (In re Jeter)*, 48 B.R. 404, 410 (Bankr.N.D.Tex.1985) (holding that those greater rights afforded under the *D'Oench* Doctrine to the FDIC as corporate insurer are not available when it acts as receiver of a national bank). The courts and Congress have noted the importance of the FDIC in stabilizing and protecting the nation's banking system, and have accordingly determined that the FDIC, as a matter of federal statutory and common law, is immune to various defenses and claims of an obligor when those are based on secret side agreements between the obligor and the bank. 12 U.S.C. § 1823(e) (West Supp. 1986) and *D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) [hereinafter cited as *D'Oench* ].

It is well established that when determining whether the FDIC is subject to a claim or defense, it is federal law that governs the question and not state law. *E.g. D'Oench*, 315 U.S. 447, 62 S.Ct. 676; *Federal Deposit Insurance Corp. v. Castle*, 781 F.2d 1101 (5th Cir.1986); *Gunter*, 674 F.2d at 869. Thus, the rights the Bank would have in the instant case under Texas law does not determine the rights of the FDIC which arise under federal law.

Determining that federal law applies does not resolve the question, however. The next step in the Court's analysis requires that it give content to that federal law. *Gunter*, 674 F.2d at 868; *see United States v. Kimbell, Foods, Inc.*, 440 U.S. 715, 727, 99 S.Ct. 1448, 1457–58, 59 L.Ed.2d 711 (1979) (determining the content of the federal rule of decision to be applied to the SBA and FHA loan programs). The FDIC argues that under federal law, the result should be uniform in all States and that the result should be that the lien is valid in the hands of the FDIC. The Howards do not dispute that federal law applies, but urge that state law be adopted by this Court as the federal rule of decision on the issue of the validity of the lien.

*Federal Statutes as the Source of Federal Law.*

Federal statutes governing the FDIC and the federal program it implements would, of course, be controlling. The only arguably applicable provision is found in 12 U.S.C. § 1823(e), which provides:

(e) Agreements against interests of Corporation

No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

12 U.S.C. § 1823(e) (West Supp.1986).

■ Where there is no secret oral agreement, § 1823(a) is not applicable.[1] In the instant case, no agreement is sought to be enforced by the Howards against the FDIC, but rather it is the FDIC which seeks to enforce an agreement (the Correction Deed of Trust). The Howards do not rely on any agreement, but rather assert a claim based on a well established body of law of the State of Texas, which provides that the agreement which the FDIC seeks to enforce is void to the extent it provides for a lien on the homestead to secure obligations which are neither for purchase money, taxes nor improvements.

Neither the FDIC nor the Howards have argued that the parties entered into some secret oral agreement that the lien would not attach to the homestead, in spite of the language in the Correction Deed warranting that the lien is valid. Moreover, such an agreement is irrelevant to the Howards' position because Texas law does not recognize even express, voluntary waivers and

disclaimers of the constitutional right to claim a homestead. *White v. Luton (In re White)*, 47 B.R. 98, 101 (Bankr.S.D.Tex. 1985); *see also Texas Land and Loan Company v. Blalock*, 76 Tex. 85, 13 S.W. 12, 13 (1890) ("If property be homestead in fact and law, lenders must understand that liens cannot be fixed upon it, and that declarations of husband and wife to the contrary, however made, must not be relied upon. They must further understand that no designation of homestead, contrary to fact, will enable parties to evade the law, and incumber homesteads with liens forbidden by the constitution." [citations omitted] ).

Thus, even if such a secret oral agreement were to have existed, and the Court were to find that § 1823(e) barred its use against the FDIC, there would still remain to be determined the question of whether the Howards' argument based solely on State homestead laws is barred by § 1823(e) or any other federal law.

■ The Court holds that the Howards' assertion that FDIC's lien is invalid because of the Texas homestead laws is not barred by § 1823(e). Those laws exist independent of any agreement between the parties and, indeed, in spite of any agreement. *See Federal Deposit Insurance Corp. v. Blue Rock Shopping Center*, 766 F.2d 744, 753 (3d Cir.1985) (§ 1823(e) has not been applied to bar defenses in cases where "the parties contend that no asset exists or an asset is invalid *and* that such invalidity is caused by the acts independent of any understanding or side agreement.")

Both parties next contend that the applicable federal law can be found in § 522 of the Bankruptcy Code. The Court finds lit-

---

1. *See e.g. Federal Deposit Insurance Corporation v. Hatmaker*, 756 F.2d 34 (6th Cir.1985) (obligor's claim that he signed note in blank upon representation of bank officer that a $12,000 amount would be filled in, when in fact a $60,-000 amount was, is the type of fraud in the inducement that is based on an oral agreement and is barred by § 1823(e); it is distinct from a misrepresentation by the bank of an existing fact that induces the party to make a note, which is a type of fraud in the inducement not

barred by § 1823(e) because there is no agreement); and *Federal Deposit Insurance Corporation v. Gulf Life Insurance Co.*, 737 F.2d 1513 (11th Cir.1984) (§ 1823(e) does not bar defenses, such as waiver, estoppel and unjust enrichment, which are not based on parties' mutual assent); and *Gunter*, 674 F.2d at 867 (no agreement existed, and therefore § 1823(e) did not apply to bar obligor's claim that the bank's fraudulent misrepresentations rendered the transaction invalid from the beginning).

tle support in that provision for either side's position.

First, although the case at bar involves debtors in bankruptcy and the decision the Court makes here is necessarily limited to those facts, it must be recognized that this issue is not unique to a case under the Bankruptcy Code. Presumably, the First National Bank of Midland, and other failed banks whose assets have been acquired by the FDIC, made loans to, and took deeds of trust from, far more debtors not in bankruptcy than those who are. The argument that the rights of the FDIC, as to the validitty of a lien on a Texas homestead, are to be determined by reference to the Bankruptcy Code is, practically speaking, a myopic approach. Neither side has represented, nor has the Court found, any authority which considers the relationship of either 12 U.S.C. § 1823 or the federal common law governing FDIC's rights, to 11 U.S.C. § 522, nor any legislative history on either statutory provision that indicates Congress contemplated this issue when considering those provisions.

Specifically, the FDIC argues that § 522 of the Bankruptcy Code determines federal homestead law by providing in subsection (d)(1) for an exemption in real property, and in subsection (f) a list, which the FDIC claims is exclusive, of the liens which can be avoided where the lien impairs an exemption. Because the FDIC's lien does not fall into one of the categories listed in § 522(f), the FDIC claims the lien cannot be avoided. In the Court's opinion, the FDIC's argument is too broad; under this rationale the lien against the Howards' homestead would be enforceable in bankruptcy by anyone, even the original lender.

The Howards contend that the applicable federal homestead law is found in § 522(b)(2), which allows a debtor to exempt any property that is exempt under State or local law. The Debtors argue that this provision incorporates the Texas homestead laws as federal law, enforceable against the FDIC. The Howards' argument does not go far enough.

The Court agrees that § 522, as the bankruptcy exemption provision, does indeed include a federal homestead provision under subsection (b)(2). *Small Business Administration v. Bubert*, 61 B.R. 362, 363 (W.D.Tex., 1986) [hereinafter cited as *Bubert*]. It is true that in applying § 522(b) and giving content to it as federal law, "the bankruptcy courts must resort to state law for interpretation of state exemption rights in homesteads." *In re Barnhart*, 47 B.R. 277 (Bankr.N.D.Tex.1985) (citing 3 Collier on Bankruptcy ¶ 522.23 (15th ed. 1984)). Thus, the Texas homestead laws regarding the invalidity of liens that are not purchase money, tax, or improvements liens are enforceable in a bankruptcy case, by virtue of § 522(b)(2), against individuals, corporations, private institutions and *some* federal agencies. *See e.g. Bubert*, (SBA's lien void); *White v. Luton (In re White)*, 47 B.R. 98 (Bankr. S.D. Texas 1985) (individual's lien void as to homestead portion of property); *and In re Parker*, 27 B.R. 932 (Bankr.N.D.Tex.1983) (bank's lien void).

This analysis, however, falls short of resolving the question before this Court, and merely restates it: whether Texas homestead laws should be enforceable in this bankruptcy case *against the FDIC*. That issue can only be determined by consideration of the federal common law.

*Federal Common Law*

In analyzing the federal common law concerning the rights of the FDIC, the Court must begin with the seminal Supreme Court case on the subject, *United States v. Kimbell Foods*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) [hereinafter cited as *Kimbell*]. *Gunter*, 674 F.2d at 868.

■ Where the statutes authorizing a federal program do not specify the appropriate rule of decision, federal courts should "fill the interstices of federal legislation 'according to their own standards.'" *Kimbell*, 440 U.S. at 727, 99 S.Ct. at 1458 (quoting *Clearfield Trust Co. v. United States*, 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943)). To do so, the How-

ards urge that the Court adopt Texas law, while the FDIC urges the creation of a uniform rule under which the lien would be valid.

"Controversies directly affecting the operations of federal programs, although governed by federal law, do not inevitably require resort to uniform federal rules." *Kimbell*, 440 U.S. at 727, 99 S.Ct. at 1458. The vast majority of cases have, however, found that a uniform rule is warranted when considering controversies involving the FDIC.[2] There are, however, a few exceptions where state law has been adopted as the federal rule of decision.[3]

While the cases strongly favor a uniform federal rule, they do not mandate one. The United States Court of Appeals for the Fifth Circuit has not gone beyond holding that state law defenses against the FDIC which are based on side agreements are barred. Most of the cases have dealt with state and common law fraud claims asserted against the FDIC, a very different issue from the state constitutional right asserted here. This Court believes that the *Kimbell* analysis which was used by the *Gunter* Court must be applied to each claim or defense raised by an obligor against the FDIC, and that, depending on the claim or defense, different results may pertain as to the necessity of a uniform federal rule.

The Supreme Court in *Kimbell* set forth three factors to be balanced in deciding whether to formulate a uniform federal rule or to adopt state law as the federal rule of decision: (1) whether the federal program is one which by its nature requires nationwide uniformity; (2) whether adopting the state law would frustrate the specific objectives of the federal program; and (3) whether applying a uniform rule would disrupt commercial relations predicated on state law. *Kimbell*, 440 U.S. at 728–29, 99 S.Ct. at 1458–59.

The analysis of the first two of these factors provided by the Court of Appeals for the Eleventh Circuit in *Gunter* is applicable in its entirety to this case. *See Gunter*, 674 F.2d at 869–72. Those two factors, here as in *Gunter*, weigh heavily in favor of protection for the FDIC. *Id.* at 869. While this Court concurs in, and adopts, the *Gunter* Court's analysis and conclusion regarding the need for uniformity with regard to the FDIC and the frustrating effect state laws might have on the goals served by the FDIC, one point which is relevant to the issue before this Court militates in favor of adopting state law in this case and warrants discussion.

This case is distinguishable from *Gunter* and the majority of cases considering the rights of the FDIC, in that it does not involve a note purchased by the FDIC as an asset of the bank, but rather only the lien securing that note. This distinction is important because even if the lien were invalid, the FDIC would still have recourse against the obligor based on the note.[4]

---

**2.** *See e.g. Gunter v. Hutcheson*, 674 F.2d 862 (11th Cir.), *cert. denied* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982) (uniform rule barring defense of fraud in the inducement); *Gilman v. Federal Deposit Insurance Corp.*, 660 F.2d 688 (6th Cir.1981) (uniform rule barring defense under federal securities laws); *Federal Deposit Insurance Corp. v. Tito Castro Construction, Inc.*, 548 F.Supp. 1224 (D.P.R.1982) (uniform rule barring defense under Puerto Rico usury statute), *aff'd on other grounds*, 741 F.2d 475 (1st Cir.1984); *Federal Deposit Insurance Corp. v. Gulf Life Insurance Co.*, 737 F.2d 1513 (11th Cir.1984) (uniform rule barring defenses of waiver, estoppel and unjust enrichment); *Federal Deposit Insurance Corp. v. Blue Rock Shopping Center*, 766 F.2d 744 (3rd Cir.1985) (uniform rule providing defense of unjustifiable impairment of collateral).

**3.** *See Federal Deposit Insurance Corp. v. Lattimore Land Corp.*, 656 F.2d 139, 148 n. 16 (5th Cir.1981) (adopting a state conflicts of law rule rather than applying a uniform federal conflicts rule) and *Federal Deposit Insurance Corp. v. Braemoor Associates*, 686 F.2d 550 (7th Cir. 1982) (adopting state substantive law as the federal rule of decision in determining the rights of the FDIC suing on bank's cause of action against bank's directors, the cause of action having been purchases as an asset of the bank, by the FDIC in its corporate capacity).

**4.** This is not to say that the lien has no value to the FDIC. Quite the contrary may be true in the present case, where the note may be dischargeable in the Howards' bankruptcy.

Again, however, the Court must recognize that not all of the First National Bank of Midland's

The fact that the asset here merely *secures* an obligation, and does not *create* one, means that the effect of the Texas homestead laws on the FDIC's rights is somewhat less than that of the state laws which might be a defense on the note itself.

■ It is consideration of the third and final *Kimbell* factor, the effect of a uniform federal rule on settled commercial expectations under state law, that compels this Court's conclusion that the FDIC's lien on the homestead, to the extent it is not based on purchase money or improvement loans or tax claims, is invalid.

The FDIC argues that because the lien was recorded, any subsequent purchaser or lender had notice of the lien, and therefore no harm would come from holding that the lien is valid in the hands of the FDIC. This argument overlooks the possibility that one with knowledge of the facts may have relied on state law, under which the lien is void, regardless of recordation. Moreover, because the Howards' open and continuous possession of the property would have constituted notice to a purchaser of its homestead character, such purchaser would have been required under Texas law to inquire as to the true facts and would have discovered the lien was not valid in the hands of the bank. *See Burkhardt v. Lieberman*, 138 Tex. 409, 159 S.W.2d 847 (1942) and *Lincoln v. Bennett*, 138 Tex. 56, 156 S.W.2d 504 (1941) (inquiry by subsequent purchaser of land or of lien required where property actually occupied by owners for homestead purposes). A uniform rule holding the lien valid merely because of the subsequent and unpredictable entry of the FDIC into the picture would bring results contrary to the expectations and justifiable reliance of the purchaser.

In general, financial institutions, contractors and homeowners all rely on state law as the sole source of homestead law, and having state law as the sole source creates a stability in commercial transactions that would be threatened by the injection of an overriding federal law in the area. *Small Business Administration v. Bubert (In re Bubert)*, 61 B.R. 362, 366 (W.D.Tex.1986).

More important, however, is the effect such a uniform rule as proposed by the FDIC would have on the interests of the homestead claimant himself, and on the interests of the State of Texas in protecting his rights. Admittedly, the evidence in this case shows little or no actual expectations on the part of the Howards at the time the Deeds were executed, because of their lack of awareness at the time of the right to claim the 194.71 acres as homestead. However, their ignorance of the law does not alter their entitlement under the law. It also does not preclude the Court from considering their interest now in asserting that entitlement, and the State's interest in enforcing it.

It is true that the homestead laws vary widely from State to State. A State's homestead laws are matters involving a balancing by its lawmakers of many competing interests. *Id.* at 366. "By its laws, a state may attempt to encourage new families to settle in the state, or it may alternatively encourage the introduction of new capital from financial institutions. The correct balance of these factors must necessarily differ from state to state." *Id.* at 366.

The exemptions provided by the different States' laws also reflect their varying degrees of interest in avoiding dependence by their residents on benefits provided by the State, through insuring that some of a resi-

---

borrowers have filed, or will file, for protection under Title 11 to obtain a discharge.

Also, the Court expresses no opinion on those cases where the borrower has committed actual fraud, or made affirmative misrepresentations regarding a homestead claim, and what effect such facts may have on the dischargeability of the underlying note. There is no evidence before the Court at this time to suggest this is such

a case. The evidence points merely to a situation where the parties (the Howards and the Bank) simply did not consider the possibility of a homestead claim on the 194.71 acres. The boilerplate warranty language contained in the Correction Deed of Trust, which was prepared by the Bank, and the existence of the Howards' signatures thereon, alone, would not support a finding of non-dischargeability.

dent's property remains unreachable by creditors. Texas has one of the most liberal homestead exemptions, and considers the exemption an inalienable constitutional right. Tex. Const. art. XVI, § 50; *compare* Tex.Prop.Code Ann. § 41.001 (Vernon 1984) (rural real property exemption of 200 acres, without regard to value) *with* Ill. Ann.Stat. ch. 110, § 12–901 *et seq.* (Smith-Hurd Supp. 1984–85) (real property exemption with limit of $7500 in value). By its laws, Texas has demonstrated a strong interest in protecting its residents, even from themselves. (See discussion, *supra*, p. 503 on the invalidity of homestead waivers.) The Court hesitates to upset that carefully struck balance, and override the policy decision it represents, without clearer guidance from Congress.

In addition to the absence of a clear expression of Congressional intent, the Court finds no judicial authority for elevating the FDIC to a unique status among lienholders, in complete abrogation of State law.

*D'Oench* stands as authority for a federal policy of protecting the FDIC from secret agreements. *Federal Deposit Insurance Corp. v. Hoover-Morris Enterprises,* 642 F.2d 785, 787–88 (5th Cir.1981). In addition, *D'Oench* required an element of fault on the part of the obligor. *Gunter,* 674 F.2d at 872 n. 14. Over the years, however, *D'Oench* has been applied to bar defenses apparently not attributable to the conduct of the obligors. *Federal Deposit Insurance Corp. v. Castle,* 781 F.2d 1101, 1108 n. 3 (5th Cir.1986) (quoting *Federal Deposit Insurance Corp. v. Powers,* 576 F.Supp. 1167, 1171 (N.D.Ill.1983), *aff'd.,* 753 F.2d 1076 (7th Cir.1984)). Even the United States Supreme Court in *D'Oench* indicated that there may be a limit to the ruling in that case:

No doubt many questions as to the liability of parties to commercial paper which comes into the hands of the [Federal Deposit Insurance] Corporation will best be solved by applying the local law with reference to which the makers and the insured bank presumably contracted. The Corporation would succeed only to the rights which the bank itself acquired where ordinary and good faith commercial transactions are involved.

*D'Oench,* 315 U.S. at 474, 62 S.Ct. at 687 (Jackson, J., concurring).

Generally, in fashioning a uniform rule protecting the FDIC, the courts have not gone beyond according the FDIC rights equivalent to those of a holder in due course (an "HDC").[5]

As was the case in *Gulf Life,* the asset here, the lien, is not a negotiable instrument and therefore, strictly speaking, the doctrine of holder in due course does not apply. However, the comparison of the FDIC to an HDC is nevertheless apt. *Federal Deposit Insurance Corp. v. Gulf Life Insurance Co.,* 737 F.2d 1513, 1518 (11th Cir.1984). The result achieved by the creation of a uniform rule that elevates the FDIC to a status equivalent to an HDC in the case at bar differs from the results reached in cases heretofore considered by the courts, because the "defense" the Howards assert, the Texas homestead laws, is distinguishable from the personal defenses raised in those other cases.

■ Under Texas law, the homestead provisions asserted by the Howards render the original transaction (the attempted granting of the lien) void and not just voidable. *See* Tex. Const. art. XVI, § 50 ("No mortgage, trust deed, or other lien on the homestead *shall ever be valid,* except for

---

**5.** *See e.g. Federal Deposit Insurance Corp. v. Wood,* 758 F.2d 156 (6th Cir.1985) (barring defense of usury and noting that its use against an HDC would be barred); *Federal Deposit Insurance Corp. v. Gulf Life Insurance Co.,* 737 F.2d 1513 (11th Cir.1984) (barring defenses of waiver, estoppel and unjust enrichment and noting their use against an HDC would be barred); and *Gunter,* 674 F.2d 862 (barring defense of fraud in the inducement and noting its use against an HDC would be barred). *See also* Tex.Bus. & Comm.Code Ann. §§ 3.305, 3.306 (Tex.UCC) (Vernon 1968) and J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 14–19, 10 (2d ed. 1980) (certain personal defenses not valid against one with status of an HDC).

the purchase money therefor, or improvements made thereon ..." (emphasis added)). In this regard, the Howards' claim is a real defense to the enforcement of the lien, distinct from the personal defenses the courts have held barred when asserted against the FDIC.

An analogy can be drawn to the facts presented in *Federal Deposit Insurance Corp. v. Barrera*, 595 F.Supp. 894 (D.P.R. 1984) and *Federal Deposit Insurance Corp. v. Bird*, 516 F.Supp. 647 (D.P.R. 1981), in which the Courts held that if a note was unenforceable at the time the FDIC acquired it because of the state statute of limitations, the transfer of the note to the FDIC could not revive it, notwithstanding the longer federal statute of limitations covering actions by the FDIC. In the instant case under the clear language of the Texas Constitution, the lien was an "utter nullity" and unenforceable at the time it was acquired by the FDIC. *Burkhardt v. Lieberman*, 138 Tex. 409, 159 S.W.2d 847, 850 (1942). As with the notes in the *Barrera* and *Bird* cases, the lien cannot be "revived" by its transfer to the FDIC and the application of federal law.

The fairness of those decisions that give the FDIC rights equivalent to those of an HDC is undeniable. The disruption of settled commercial transactions that results from according the FDIC that status is minimal, if not non-existent. *Gunter*, 674 F.2d at 872 ("The Gunters, therefore, are in no worse position under a federal rule protecting the FDIC than they would have been had [the bank] transferred the note to another banking institution in the ordinary course of business."); *accord, Federal Deposit Insurance Corp. v. Wood*, 758 F.2d 156, 161 (6th Cir.1985) ("From the maker's view, there is no difference between his bank failing and the note going to the corporate FDIC, and his bank failing after selling the note to a holder in due course."); and *Federal Deposit Insurance Corp. v. Gulf Life Insurance Co.*, 737 F.2d 1513, 1518 (11th Cir.1984) ("[I]n the majority of cases little dashing of commercial expectations would result from a uniform rule

protecting the FDIC from such [personal] defenses.")

A review of Texas law reveals that the creation of a uniform federal rule according the FDIC the status of an HDC (or its equivalent in real property transactions such as the one here, a bona fide purchaser, for value, and without notice) would not yield uniform results across the nation, under the facts of the instant case.

The FDIC has cited *Martin v. Granger*, 204 S.W. 666 (Tex.Civ.App.—Texarkana 1918, no writ) and the cases cited therein, for the propostion that:

> it is well settled that, while an attempt to unlawfully incumber the homestead may be invalid as between the parties to the original contract and those having notice of the facts, yet that constitutional immunity will not be enforced against an innocent holder for value of the debt and lien thus created.

*Id.* at 667 (cites omitted). This Court finds the later authority of the Texas Supreme Court case of *Pappas v. Gounaris*, 158 Tex. 355, 311 S.W.2d 644 (1958) to be more persuasive than the *Martin* case. The Court in *Pappas* held that the doctrine of innocent purchaser applies only to the note secured by the deed of trust on the homestead, and not to the right to enforce the lien on the homestead. *Pappas*, 311 S.W.2d at 647.

Texas law on the applicability of the doctrine of bona fide purchaser to homestead liens is not altogether clear. The issue of a purchaser's notice of the homestead character of the property does arise in the context, not of whether the lien is valid, but of whether the debtors are estopped to assert their claim of homestead against the purchaser. The Court in *American Exchange National Bank v. Jeffries*, 36 S.W.2d 558 (Tex.Civ.App.—Dallas 1931, writ dism'd) clearly distinguished the use of notice in an estoppel defense from the threshold issue of the validity of the lien:

> The fact that the lien is void is not necessarily

conclusive. ... Appellant contends that appellees have estopped themselves, un-

der the facts of this case, from pleading and proving that the property in question was actually their homestead at the time of the creation of the lien. ... As Appellees were living on this property at the time the pretended lien was executed, and were in exclusive possession of same, both ... the original lender, and appellant, as such lender's assignee, were charged by law with notice of the fact that this property was in use by appellees as homestead property, and that the pretended lien is void because forbidden by the Constitution.

*Id.* at 559–60.

The cases dealing with this estoppel issue unanimously conclude that where a homestead claimant is in open and continuous, actual possession and use of the property, as the Howards have been, the lender is charged with notice of the homestead character of the property and the claimant is not estopped from asserting that under the Texas constitution the lien is void. Thus, when there is possession by the claimant, the defense of being a bona fide purchaser, for value and without notice is unavailable, regardless of whether the issue is raised as a direct defense to the validity of the lien, or indirectly as part of an estoppel defense.

■ The absolute invalidity under Texas law of the non-purchase money lien on the Howards' homestead, even as to bona fide purchasers, and even in the face of the deed language warranting the validity of the lien, distinguishes this case from those involving the assertion of merely personal defenses against the FDIC. In the absence of some indication that Congress meant to exempt the FDIC from the effect of homestead laws, the Court holds that the FDIC is subject to the laws of Texas governing the validity of liens on a homestead, and that its lien on the Howards' homestead is void to the extent it does not secure purchase money, an improvement loan, or a tax claim.

Having determined that the FDIC lien, to the extent it secures the loan of $493,-934.78, is not valid as applied to the 194.71 acres claimed as homestead, the Court now reaches various other issues raised by the Howards.

*The Release by the FHA*

The first of these issues is the validity of the lien securing the $82,000 purchase money loan originally made by the FHA. The Howards introduced at trial a written Release of this lien, executed by the FHA prior to the execution of the Correction Deed by the First National Bank of Midland. The FDIC presented no evidence of the transfer of this lien from the FHA to the First National Bank of Midland. The Release was also recorded in the Deed Records of Midland County prior to the execution of the Correction Deed.

■ The Court holds that 12 U.S.C. § 1823(e) does bar the Howards' use of the Release as a defense against enforcement of the lien securing the FHA loan, the balance of which is stipulated according to the FDIC's records to be $22,530.27 in principal plus $13,390.07 in accrued interest. The Release is an "agreement which tends to diminish or defeat the right, title or interest of the Corporation in [an] asset acquired by it under [§ 1823]," and is clearly invalid against the FDIC under the terms of § 1823(e) because it fails to meet the requirements of that section. *See* 12 U.S.C. § 1823(e) (West Supp.1986), quoted on p. 9, *supra.* The FDIC may invoke the protection of § 1823(e) even where the obligor dealt with a third party, not the insolvent bank which later acquires the asset, in this case the lien. *Chatham Ventures, Inc. v. Federal Deposit Insurance Corp.,* 651 F.2d 355, 360 (5th Cir.1981); *accord, Federal Deposit Insurance Corp. v. Hoover-Morris Enterprises,* 642 F.2d 785, 787 (5th Cir.1981) (holding that assertion of such side agreements with third parties is precluded by *D'Oench* as well as by § 1823(e)).

Moreover, even if the Court held that the Release was admissible against the FDIC, the Howards have failed to prove that the release is a defense to the enforcement of the lien evidenced by the Correction Deed

of Trust. No showing has been made by the Howards (and it is their burden to prove the affirmative defense of release) that the Release by the FHA was not executed in consideration for full payment from funds advanced directly to the FHA, or indirectly through a loan to the Howards, by the First National Bank of Midland. This scenario is logical and consistent with the Howards' later execution of the Correction Deed of Trust to the First National Bank of Midland. Therefore, the Court holds that, even if § 1823(e) does not bar the assertion of the Release, the Howards have failed to show that the Release defeats the lien of the FDIC, which acquires the purchase money character of the original loan made by the original lender, the FHA.

*The Howards' right to have past payments applied to the portion of the lien covering the homestead*

To summarize the Court's findings thus far, the FDIC's lien, evidenced by the Correction Deed of Trust, which secures the principal balance and interest still owing on the $493,934.78 First National Bank of Midland loan, is invalid to the extent it purports to cover the 194.71 acres claimed as homestead. The lien is valid, however, to the extent it covers non-homestead property. In addition, the FDIC has a valid lien, covering both the homestead and non-homestead acreage described in the Correction Deed, to the following extent:

$64,141.28 principal balance of Eureka loan

$36,119.33 accrued interest on Eureka loan

$22,530.27 principal balance on FHA loan

$13,390.07 accrued interest on FHA loan

for a total of $136,180.95, plus the amount of principal balance and accrued interest on the $18,300.00 First National Bank of Midland loan, which amount is not in evidence.

The Howards introduced evidence, undisputed by the FDIC, that they had made payments in excess of $308,000 on all the loans covered by the Correction Deed since the execution of that Deed. The Howards contend that they were entitled to have the payments made applied first to the purchase money loans secured by the homestead, and that those payments were more than sufficient to have extinguished all of those loans. Thus, they argue, the homestead is now completely unencumbered

The evidence introduced by the Howards at trial showed that no portion of the payments they made subsequent to the transfer of the lien from Eureka to the First National Bank of Midland, was applied to the Eureka purchase money loan. The Howards introduced at trial a letter written by the Senior Vice President of Eureka Life Insurance Company to Mr. Howard, dated November 4, 1985. The FDIC did not object to the letter's admissibility. The letter states that the balance of the $122,000 Eureka note, on the date the lien securing it was transferred to the First National Bank of Midland, was $64,141.28. This amount is identical to the amount the parties have stipulated is shown on the records of the FDIC as the present principal balance of this loan.

As to the other two purchase money loans, no evidence is before the Court as to the balances on the dates of transfer. Therefore, the Court is unable to perform the arithmetic necessary to determine whether the payments are sufficient to extinguish the liens securing these loans. However, performance of this essentially mechanical task is not necessary to a determination of whether the Howards have a *right* to have the payments applied to these loans before they are applied to the non-purchase money loans.

■ The law regarding the appropriation of payment is clear. "When a debtor fails to properly exercise his power to direct the application of the payment, the creditor ordinarily may apply the payment to any valid and subsisting claim he has against the debtor." *W.E. Grace Manufacturing Company v. Levin,* 506 S.W.2d 580, 585 (Tex.S.Ct.1974). The promissory note secured by the Correction Deed of Trust is not in evidence, nor have the Howards presented any other evidence that

they directed their payments to be applied to any particular portion of that note which combined all of the previous notes held by the First National Bank of Midland. Thus, the First National Bank of Midland had the right to apportion those payments as it saw fit, up until the time the controversy arose (i.e., when the Motion to Avoid Lien was filed). *See United States v. Kirkpatrick*, 22 U.S. (9 Wheat) 720, 737, 6 L.Ed. 199 (1824) ("It is certainly too late for either party to claim a right to make an appropriation, after the controversy has arisen, and *a fortiori* at the time of the trial."). The Howards stipulated to the amounts of the balances, shown on the records of the FDIC, for each of the debts comprising the promissory note. There is no evidence as to when the First National Bank of Midland, or the FDIC for that matter, appropriated the payments to the various debts. The Howards have not shown, and the Court cannot assume, that the payments were not appropriated, and the balances were not arrived at, before the controversy arose. Thus, the Court finds that the Howards have failed to show that the First National Bank of Midland and/or the FDIC were not entitled to apply the payments exactly as they have done.

*The Howards' Right to Have the Non-Exempt Property Sold First*

The final issue raised by the Howards is whether the FDIC can be forced to foreclose on and sell the non-exempt property first, and apply the proceeds of that sale to those portions of the debt that are purchase money and secured by a valid lien on both exempt and non-exempt property.

█ "In Texas, it is well settled that a debtor has an equitable right to force a purchase money mortgage to be satisfied by excess or non-exempt property before any attempt is made by the mortgagee to reach that which is exempt as homestead." *In re Greene*, 40 B.R. 807, 809 (Bankr.N.D. Tex.1984), and cases cited therein. This has been held true even in a bankruptcy setting, where its effect would be to destroy assets against which general credi-

tors may have a claim, *Abramson v. Bobbitt (In re Bobbitt)*, 3 B.R. 372 (Bankr.N.D. Tex.1976), or against which holders of valid, judicial liens may have a claim, *In re Barnhardt*, 47 B.R. 277 (Bankr.N.D.Tex. 1985). The Court holds that the FDIC must foreclose on and sell the non-exempt acreage covered by the Correction Deed of Trust, and apply the proceeds of that sale to those portions of its lien that secure valid, purchase money obligations, before it may resort to foreclosure and sale of the Howards' homestead.

*Conclusion*

The Court herein holds that the portion of the FDIC's lien which secures non-purchase money debt, i.e., the $493,934.78 loan originally made by the First National Bank of Midland, is, under federal law, invalid as to the 194.71 acres claimed as homestead. The Court further holds that the FHA Release is not enforceable against the FDIC and in any event does not affect its secured claim based on that debt, of $22,530.27 in principal plus $13,390.07 in accrued interest. The appropriation of payments already made shall stand, and the balances on the portions of the FDIC's claim relating to the Eureka Life Insurance Company's loan ($64,141.28 in principal plus $36,-119.33 in accrued interest), the FHA debt ($22,530.27 in principal plus $13,390.07 in accrued interest) and the First National Bank of Midland loan (original principal balance of $18,300.00, present balance unknown) shall constitute the amount of the claim that is secured by all the property described in the Correction Deed, both exempt and non-exempt. Finally, the FDIC shall be required to foreclose on and sell the non-exempt acreage first in satisfaction of the three debts described above. Any excess received over the amount of those debts may be applied to the First National Bank of Midland debt in the original principal sum of $493,934.78. Any deficiency in satisfying the three purchase money debts described above may be satisfied by foreclosure and sale of the 194.71 acres claimed as homestead.