FEDERAL DEPOSIT INSURANCE COR-
PORATION, Plaintiff-Appellee,

v.

The MERCHANTS NATIONAL BANK
OF MOBILE, Defendant-Appellant.

No. 82–7351.

United States Court of Appeals,
Eleventh Circuit.

Feb. 24, 1984.

Brock B. Gordon, Alan C. Christian, Mobile, Ala., for defendant-appellant.

Joseph B. Mays, Jr., Birmingham, Ala., Donald J. Stewart, Mobile, Ala., for plaintiff-appellee.

Before GODBOLD, Chief Judge, RONEY and SMITH *, Circuit Judges.

GODBOLD, Chief Judge:

## I. Introduction

By 12 U.S.C. Sec. 1823(e) (1976) Congress gave to assets acquired by the Federal Deposit Insurance Corporation special protections that are not available to ordinary holders of commercial paper and are not dependent on whether FDIC would qualify as a holder in due course under state law. This case concerns application of Sec. 1823(e) to an asset acquired by FDIC from a failed bank. Section 1823(e) provides:

No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approv-

al shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

Merchants National Bank (MNB) held 80% of a $3.9 million loan to Ball-Co Contractors, Inc. Wilcox County Bank (WCB), along with other banks, participated in the remaining 20% of the loan. WCB's share was $84,000. The $3.9 million Ball-Co loan carried an 80% guarantee from the Farmers Home Administration. WCB says that it participated ratably in the guaranteed portion. MNB says that WCB participated in only the unguaranteed portion.

The certificate of participation issued by MNB to WCB says:

To: WILCOX COUNTY BANK

This is to certify that you have a participation of $84,000.00 EIGHTY FOUR THOUSAND & NO/100 DOLLARS in the following described loan held by the undersigned:

BORROWER: BALL–CO CONTRACTORS, INC.

ADDRESS: P.O. Box 880 Bay Minette, AL

AMOUNT OF NOTE: $3,900,000.00

DATED: August 31, 1977

DUE: ——

INTEREST RATE: 3% over Prime

INTEREST TO YOU: Same

COLLATERAL: All accounts receivable and contract rights of Debtor, all of Debtor's inventory, including all raw materials, work in process, finished goods and other tangible property owned and held for sale or lease or furnished under contracts of service or used or consumed in Debtor's business, all equipment used in the conduct of the business of Debtor; and all motor vehicles and automotive equipment used in the conduct of the business of Debtor now owned or hereafter existing or acquired.

\*   \*   \*   \*   \*   \*

The Merchants National Bank of Mobile shall be entitled to hold the note or other evidence of debt together with all collateral or security thereto, and to share in

---

* Honorable Edward S. Smith, U.S. Circuit Judge    for the Federal Circuit, sitting by designation.

same on a pro rata basis with the holder hereof, and to exercise its discretion in collecting the same and selling any security therefor. The said Merchants National Bank of Mobile shall be free from any liability to the holder hereof except for its proportionate share of collections of principal and interest when received. It is agreed that any attorneys' fees or collection charges incurred will be shared on a pro rata basis by the participating banks.

The MNB/Ball-Co loan agreement delivered to WCB with the certificate indicates that the loan is protected by an 80% FmHA guarantee.

The minutes of WCB directors' meetings say:

A participation loan previously approved by the Loan Committee Members Jim Branum and Joe Williams was ratified. *This loan for $84,000 participating with the Merchants National Bank of Mobile on Ball-Co Contractors, Inc., which has an 80% FHA guarantee on an original loan of $3,900,000.* This loan is considered a credit worthy loan, however, it was approved only after being advised by the Merchants National Bank of Mobile that the loan sufficient to reduce personal loans held by the bank on Lowell Harrelson would be placed in jeopardy if we did not participate. Our loans to Mr. Harrelson including the loan charged off amount of $78,450.46 and an additional loan of $38,700.00, which we had previously sold to our principal correspondent, Southern National Bank. *The advantage we gained from getting these loans paid in full certainly justifies our participation in a loan for approximately the same amount, which has an 80% FHA guarantee.* We have been assured by the participating bank that funds have been provided in the advance on the new loan to retire Mr. Harrelson's personal debts and we have, also, been assured by Mr. Harrelson that these loans will be taken out soon.

(emphasis added).

MNB sold its 80% participation in the loan to Eastern Airlines Pension Fund.

Ball-Co defaulted on its obligations under the note and loan agreement, Eastern called on FmHA to honor its guarantee, and FmHA paid Eastern an amount equal to 80% of the value of the loan.

WCB, of Camden, Alabama, was formerly a state banking association chartered under the laws of Alabama. The Alabama superintendent of banks declared WCB insolvent and appointed FDIC as receiver pursuant to 12 U.S.C. Sec. 1821(e) (1976). FDIC, as receiver, executed an agreement of sale with FDIC in its general corporate capacity. This agreement vested FDIC in its general corporate capacity with all right, title and interest in and to certain assets of WCB, including the $84,000 loan participation.

WCB received none of the proceeds from the MNB-Eastern sale and none of the payment by FmHA to Eastern on the guarantee. FDIC in its general corporate capacity sued MNB and alleged that FDIC was entitled to participate in the guaranteed portion of the loan. Specifically, FDIC alleged breach of fiduciary duty, breach of contract, and negligence by MNB because of its failure to remit to FDIC its share of MNB's "collection" on the 80% guaranteed portion of the loan that MNB sold to Eastern and FmHA subsequently paid when Ball-Co defaulted. FDIC's pleadings could also be construed, though less clearly, to allege breach of contract, breach of fiduciary duty, and negligence by MNB in the sale of WCB's participation in the 80% guaranteed portion to Eastern (taking at face value FDIC's contention that its asset was participation in the guaranteed portion) without WCB's consent and without remitting to WCB its portion of the proceeds of the sale.

MNB took the position that WCB had participated in only the unguaranteed portion of the Ball-Co loan. FDIC maintains that the books and records of the bank showed that WCB participated ratably in the guaranteed portion and that under Sec. 1823(e) FDIC, as holder of the participation, had the right to share in the proceeds of the guarantee on a pro rata basis. MNB as-

serted that FDIC, by its alleged knowledge of WCB's participation in the unguaranteed portion, was equitably estopped from relying on the books and records of the bank and that extrinsic evidence, such as intent of the parties, knowledge by FDIC, and surrounding circumstances, showed that WCB's participation was in the unguaranteed portion of the loan.

In determining whether WCB's participation was in the guaranteed or unguaranteed portion the district court correctly applied Sec. 1823(e) to exclude as irrelevant any evidence not found in the records of the bank and not meeting the statute's strict requirements. After a bench trial the district court correctly found that WCB participated in the guaranteed portion of the Ball-Co loan and accordingly entered judgment for FDIC for $87,691.40 (representing 80% of WCB's $84,000 participation plus $20,491.40 in interest). We affirm.

## II. Section 1823(e) and the finding of the district court

### A. FDIC's purchase and assumption alternative

We recently discussed the alternatives available to FDIC in discharging its duties when an insured bank fails. *See Gunter v. Hutcheson,* 674 F.2d 862, 865–66 (11th Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). When an insured bank fails, FDIC can make direct deposit insurance payoffs on insured deposits. The bank remains permanently closed, and all insured accounts are paid off to the insured limit. The direct payoff alternative is not the preferred one:

> The undesirability of the deposit insurance payoff alternative is readily apparent. A bank failure and a subsequent payoff of insured deposits results in an interruption of vital banking services to the community which the failed bank served. The failed bank's main office and any branches which it operated are permanently closed. As a consequence, virtually all of the failed bank's employees are without jobs. All time, demand and saving deposit accounts of the failed bank are frozen and any checks in transit at the time the bank closed are returned unpaid to the drawer. Furthermore, any depositor of the failed bank with a deposit account that exceeded the $40,000 statutory insurance limitations (and any other creditor with provable claims) must await the payment of ratable dividends to recover the uninsured portion of his or her deposits. Even those depositors whose accounts are fully insured suffer some hardship since the FDIC ordinarily requires several days in which to reconcile accounts and prepare deposit insurance checks. Finally, any going concern value that the failed bank may have had as a viable banking enterprise is lost irrevocably with the permanent closing of its business. As a consequence of the foregoing, the FDIC is concerned that a deposit insurance payoff in connection with the failure of a bank, particularly a sizable bank, may cause an erosion in public confidence in other banks in the community. Clearly, the failure of a sizeable bank may affect affiliated banks as well as independent banks over a wide geographic area, depending upon the extent of interbank relationships in which the failed bank was involved.

Burgee, *Purchase and Assumption Transactions Under the Federal Deposit Insurance Act,* 14 The Forum 1146, 1153 (1979) (senior counsel in office of general counsel of FDIC explains FDIC's options).

On the other hand, FDIC can undertake a purchase and assumption transaction when the insured bank fails. FDIC as receiver of the failed bank sells acceptable assets of the failed bank to another financially sound and insured bank (the assuming bank). In return the assuming bank assumes all the failed bank's deposit liabilities. FDIC as receiver obtains full value for the acceptable assets as well as a premium from the assuming bank for the "going concern" value of the failed bank. The value of the assets purchased by an assuming bank plus the premium it pays is always less than the amount of liabilities (such as deposits) that it assumes. To generate cash that can be transferred to the assuming bank to bal-

ance the value of the assets and liabilities it assumes, FDIC as receiver contracts with FDIC in its corporate capacity to purchase the assets that are unacceptable to the assuming bank. This purchase was authorized by 12 U.S.C. Sec. 1823(e) (1976) and following the Depository Insurance Flexibility Act, Pub.L. No. 97–320, 96 Stat. 1469 (1982), is now authorized by 12 U.S.C. Sec. 1823(c) (1982). Thus FDIC in its corporate capacity pays FDIC as receiver an amount equal to the cash difference between the value of the assets purchased and liabilities assumed by the assuming bank, less the amount of the premium paid by the assuming bank. *See generally Burgee, supra,* at 1154–55.

The purchase and assumption transaction has several advantages for FDIC and the public:

> The Purchase and Assumption transaction avoids the numerous adverse results of the deposit insurance payout method. Virtually all of the failed bank's depositors and other creditors are fully protected by the assumption of their deposits and debts by the assuming bank. The FDIC as insurer of deposits is relieved from the difficult and time consuming obligation of paying off hundreds or even thousands of depositors. Of utmost significance is the fact that the banking services to the citizens of the community previously served by the failed bank continue uninterrupted as the assuming bank agrees to reopen all of the failed bank's offices on the next business day. Of particular significance is the fact that the receiver obtains the benefit of a premium, which is often substantial, for the going concern value of the failed bank

that would be lost in the event of a deposit payoff.

*Id.* at 1156.

Although FDIC favors the use of the purchase and assumption alternative, it does not have unbridled discretion to employ that method. 12 U.S.C. Sec. 1823(e) (1976) allowed FDIC to purchase assets of a failed bank only "when in the judgment of the Board of Directors such action will reduce the risk or avert a threatened loss to the Corporation [FDIC]."[1] This exercise of judgment requires FDIC to measure its loss under the insured deposit payoff alternative against its loss under a purchase and assumption transaction. To calculate possible loss under the purchase and assumption transaction as compared to a pay off of insured deposits, all of the failed bank's assets must be evaluated to determine the potential cost to FDIC of assuming unfavorable assets and to determine the price to be paid by the assuming bank for acceptable assets.

The process of evaluation must be undertaken quickly. "[A] purchase and assumption must be consummated with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services." *Gunter,* 674 F.2d at 865. The special protections given FDIC in Sec. 1823(e) facilitate this process by allowing FDIC to rely on the books and records of the bank in deciding whether to undertake a purchase and assumption transaction and in buying assets unacceptable to the assuming bank. An agreement not meeting the statute's requirements cannot defeat or diminish FDIC's right, title, or interest in an asset. *See, e.g., Gunter; Chatham Ventures, Inc. v. FDIC,* 651 F.2d 355 (5th Cir.

---

1. Depository Insurance Flexibility Act, Sec. 113(m)(2), Pub.L. No. 97–320, 96 Stat. 1469 (1982), deleted this provision from Sec. 1823(e). The Act inserted a similar provision requiring exercise of judgment. *See id.* Secs. 111, 114(a)(1). That provision is codified at 12 U.S.C. Sec. 1823(c)(4)(A) (1982) and expressly limits FDIC's ability to undertake a purchase and assumption transaction unless FDIC determines that such action is "reasonably necessary to save the cost of liquidating, including

paying the insured accounts" or that continued operation of the bank is necessary to provide adequate banking services to the community. Even though this amendment essentially restates, though more specifically, the old requirement for undertaking the transaction, FDIC purchased the asset in this case in 1978 under the test of 12 U.S.C. Sec. 1823(e) (1976), which is, therefore, the relevant provision for purposes of this case.

1981) (Unit B), *cert. denied,* 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1982); *FDIC v. Hoover-Morris Enterprises,* 642 F.2d 785 (5th Cir.1981) (Unit B); *Black v. FDIC,* 640 F.2d 699 (5th Cir.) (Unit B), *cert. denied,* 454 U.S. 838, 102 S.Ct. 143, 70 L.Ed.2d 119 (1981). In the case at bar FDIC was entitled to rely on the books and records of WCB in deciding to undertake the purchase and assumption transaction and in buying, in its general corporate capacity, the $84,000 participation in the Ball-Co loan.

### B. MNB's theory

The court below looked solely to documents meeting the statute's requirements and excluded all of MNB's evidence tending to show WCB participated in only the unguaranteed portion but not meeting the requirements of the statute. MNB contends that before invoking Sec. 1823(e) the court was first required to isolate and define the asset in question; that is, the court had to determine whether the asset acquired by WCB was a participation in only the unguaranteed portion of the Ball-Co loan or included a ratable participation in the guaranteed portion. And, MNB asserts, the court in isolating and defining the asset was required to consider evidence that does not meet the requirements of Sec. 1823(e), including the circumstances surrounding WCB's acquisition of the participation. This theory, that in a preliminary step the court must look to evidence not permitted by Sec. 1823(e) and then in a second step determine FDIC's rights with evidence limited by Sec. 1823(e), would destroy the effect and protection of Sec. 1823(e) in this case. MNB's construction of Sec. 1823(e) would hamper the ability of FDIC to follow the purchase and assumption alternative because uncertainty would be injected into the valuation of assets, a step crucial both in deciding to undertake the transaction and in structuring the transaction.

Section 1823(e) does not apply to every inquiry concerning an asset. It does not apply when the court determines if an asset is invalid for fraud, *see Gunter,* 674 F.2d at 867, or for breach of bilateral obligations contained in the asset, *see Howell v. Continental Credit Corp.,* 655 F.2d 743, 746–48 (7th Cir.1981) (inadequate consideration); *Riverside Park Realty Co. v. FDIC,* 465 F.Supp. 305, 312–13 (M.D.Tenn.1978) (breach of loan agreement). In such cases the parties contend that no asset exists or an asset is invalid *and* that such invalidity is caused by acts independent of any understanding or side agreement. The case before us does not fall within these narrow exceptions to Sec. 1823(e). Here MNB seeks to limit the contour of the asset as described in the certificate of participation and the Ball-Co loan agreement that MNB furnished to WCB by asserting that an ambiguity exists in the certificate and accompanying documents. Then MNB seeks to resolve the ambiguity it created, *see infra* Part II. C., by resorting to evidence not meeting Sec. 1823(e)'s requirements. Congress did not intend that Sec. 1823(e) be avoided in this manner; MNB's construction would drain substantial vitality from Sec. 1823(e), as applied to this case, by throwing into question the very records of the bank that the statute entitles FDIC to consider and rely upon. In the circumstances of this case, as against MNB, FDIC may rely on the books and records of WCB to establish its ratable participation in the guaranteed portion of the Ball-Co loan. We decide only this case. We leave to other forums whether under other circumstances deficiencies in loan documents may be so patent that extrinsic evidence may be examined.

### C. The district court's finding

The district court reviewed the evidence, discussed in part I, meeting the statute's requirements and concluded that WCB participated in the guaranteed portion of the Ball-Co loan. The MNB/Ball-Co loan agreement delivered to WCB with the certificate indicates that the underlying loan is protected by an 80% FmHA guarantee, and the certificate gave WCB the right to share in all collateral and security to the loan. The certificate listed collateral and security, and the list did not include the FmHA

guarantee, but we hold that this MNB-created ambiguity may not be resolved by MNB through an end run around Sec. 1823(e). The minutes of the directors' meetings also indicate that the WCB's participation was guaranteed.

The trial court's finding that the Ball-Co loan was 80% guaranteed, that the books and records of the bank reflected a participation in that guaranteed loan, and that FDIC is entitled to share ratably in MNB's collection[2] on the guaranteed portion is not clearly erroneous.

### III. Knowledge of FDIC

 MNB contends that knowledge by FDIC is relevant both to determine whether WCB participated in the guaranteed portion and to prove equitable estoppel against FDIC. We hold that knowledge of FDIC is irrelevant under either inquiry. The statute prescribed the requirements an agreement must meet to be valid against FDIC. If a side agreement does not meet the requirements of Sec. 1823(e), FDIC's knowledge of the terms of that side agreement does not render it valid against FDIC or estop FDIC from enforcing the agreement as contained in the failed bank's records. *See FDIC v. De Jesus Velez,* 678 F.2d 371, 375 (1st Cir.1982); *FDIC v. First Mortgage Investors,* 485 F.Supp. 445, 451–52 (E.D. Wis.1980).

Sound policy reasons dictate against holding FDIC liable for its knowledge of side agreements as well as the hidden meaning of bank assets. In the ordinary course of business examiners from FDIC's open-bank division regularly visit all insured banks and even more frequently visit failing banks. If in undertaking a purchase and assumption transaction FDIC's closed-bank division were held to matters of which the open-bank examiners had actual knowledge, but beyond the scope of Sec. 1823(e), the protection of Sec. 1823(e) would be lost. Any asset would be subject to challenge based on the alleged knowledge of bank examiners. The resulting uncertainty would undercut FDIC's ability to value assets quickly and precisely when conducting a purchase and assumption transaction. *Cf. Gunter,* 674 F.2d at 865 (discussion of speed with which transactions must be consummated to prevent halt of banking services and loss of confidence in the banking industry).

### IV. Failure to extend the discovery period

The district court did not abuse its discretion in denying further discovery concerning FDIC's knowledge of the terms of the loan participation. The discovery period had twice been extended, and evidence of FDIC's knowledge was not relevant in construing the agreement and was barred by Sec. 1823(e) if offered to validate a side agreement or to prove equitable estoppel. No showing was made that extending the discovery deadline for a third time would lead to other admissible evidence.

AFFIRMED.

2. The certificate requires MNB to remit to WCB "its proportionate share of collections of principal and interest when received." In the trial court MNB contended that WCB participated in only the unguaranteed portion of the Ball-Co loan and that MNB had remitted to WCB its share of collections on the 20% unguaranteed portion. On appeal MNB raises for the first time the contention that, if WCB's participation was in the guaranteed portion, MNB would nevertheless be free from liability because neither the sale of the 80% guaranteed portion of the loan to Eastern nor the payment of the guarantee by FmHA to Eastern, nor the combination of the two, constituted a "collec-

tion." Though not raised below, the trial court in entering judgment for FDIC implicitly found a "collection" since MNB's obligation to WCB, contained in the certificate, was to remit to WCB "its proportionate share of collections." In this posture we will not disturb that finding. *See Johnson v. Smith,* 696 F.2d 1334, 1338 (11th Cir.1983) (defenses not raised and for which proof is not offered in trial court cannot be raised for the first time on appeal); *Hall v. Board of School Comm'rs,* 681 F.2d 965, 969–70 (5th Cir.1982) (Unit B) (court will not consider for first time on appeal question that requires development of factual issues).