**FEDERAL DEPOSIT INSURANCE CORPORATION, Intervening Plaintiff-Appellee, Cross-Appellant,**

v.

**Robert L. O'NEIL, Henry D. Paschen, Jr., William J. Harte, and Edward T. Joyce, Intervening Defendants-Appellants, Cross-Appellees.**

Nos. 86–1694, 86–1766.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 24, 1986.

Decided Jan. 6, 1987.

Rehearing Denied Jan. 30, 1987.

---

Richard J. Prendergast, Richard J. Prendergast, Ltd., Chicago, Ill., for intervening defendants-appellants, cross-appellees.

Stephen M. Murray, Lord, Bissel & Brook, Chicago, Ill., for intervening plaintiff-appellee, cross-appellant.

Before WOOD and POSNER, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

POSNER, Circuit Judge.

This appeal requires us to interpret 12 U.S.C. § 1823(e), which provides in relevant part that

No agreement which tends to diminish or defeat the right, title or interest of the [Federal Deposit Insurance] Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time

of its execution, an official record of the bank.

A hospital went broke. The Continental Illinois National Bank and two other banks, plus a law firm, were the bankrupt's principal creditors after senior secured creditors who held a total of $3.5 million in claims against the hospital. A group of lawyers, Joyce for short (he was the key member of the group), which included members of the creditor law firm, submitted to the bankruptcy court a bid of $5 million for the hospital. The only other bid, Inskeep's, was for only $3.7 million, which would have left very little for the junior creditors. Joyce borrowed $1 million from the Continental bank to help finance his bid. The promissory note that he gave the bank recites that "any default or event of default under that certain agreement" between Joyce and other junior creditors (comprising mainly the banks) is a default under the promissory note. The reference to a "certain agreement" is to an unexecuted agreement which after reciting that the creditors desire Joyce to submit a competing bid for the hospital because the Inskeep bid is not large enough to pay off the indebtedness to these creditors provides that "in consideration of the foregoing recitals" Joyce agrees to do two things if his bid is accepted. First, pay some of the senior secured claims (this was what the $1 million loan by Continental was for); second, in the event Joyce succeeds in his plan to convert the hospital into a facility for treating wounds, pay most of the hospital's indebtedness to the banks, but if the plan does not succeed the banks get nothing. Joyce, who received the $1 million from Continental and deposited it in the bankruptcy court as earnest money, contends that the "certain agreement" obligated Continental (and the other two banks) to support his bid for the hospital. But when Inskeep sweetened his bid to $4.3 million the banks decided to support Inskeep's bid over Joyce's, and at the banks' urging the bankruptcy judge accepted Inskeep's bid and returned the earnest money to Joyce. Joyce then sued the banks in a state court in Illinois, alleging among other things that

they had broken their promise to support his bid and arguing that he was holding the $1 million he had gotten from Continental as a set-off to his damages against the banks.

While all this was going on Continental had gotten into serious financial difficulties and the FDIC had come to its rescue with a financial assistance program. The program included the purchase by the FDIC of promissory notes held by Continental. One of the notes purchased was Joyce's $1 million note. (His argument that the FDIC did not really acquire the note does not require discussion, in light of *Chatham Ventures, Inc. v. FDIC*, 651 F.2d 355, 358–59 (5th Cir.1981).) The FDIC intervened in Joyce's state court action, removed the entire suit to federal district court pursuant to 12 U.S.C. § 1819 and 28 U.S.C. § 1441, and then filed in that court a complaint seeking collection of the note, which had come due in the meantime. The banks and the FDIC moved for summary judgment. The district judge denied the banks' motion but granted the FDIC's motion and ordered Joyce to pay the note. The district judge then remanded Joyce's claims against the banks to state court because they were not removable by themselves. See 28 U.S.C. § 1441(c). This made the judgment in favor of the FDIC against Joyce final, and he has appealed. The FDIC has cross-appealed, seeking additional attorney's fees.

The main question is whether the banks' alleged agreement to support Joyce's bid is the type of agreement that can, without running afoul of 12 U.S.C. § 1823(e), defeat or diminish the FDIC's rights under the promissory note that it acquired from the Continental bank. We say "alleged" because the banks deny they made such an agreement and the issue has not yet been adjudicated; the district judge, before remanding Joyce's case against the banks to state court, merely refused to grant summary judgment for the banks. The "agreement" was never executed and does not state in so many words that the banks shall support Joyce's bid for the hospital. But there is evidence, including statements

made by the banks to the bankruptcy court, to suggest that such a promise was implicit in the (drafted but not executed) agreement, and was broken when Inskeep unexpectedly sweetened his competing offer; and so we shall assume for purposes of this appeal. Since the agreement was not executed, however, it might be more accurately described as an oral than as a written agreement.

The purpose behind section 1823(e), enacted in 1950, is to enable the FDIC, in deciding how to proceed with respect to a troubled bank, to make a quick and certain inventory of the bank's assets. It can do that only if it can disregard secret oral agreements that may impair the value of those assets. See Hearings before the House Banking Comm. on the 1950 Amendments to Federal Deposit Insurance Act, 81st Cong., 2d Sess. 41–42 (1950). As Joyce points out, however, the agreement here (if there was an enforceable agreement—an issue remaining for decision by the state court) was not secret. The FDIC knew about the agreement when it acquired the promissory note from Continental. Also, the agreement was written, though it may not, as we have said, have been a written agreement.

■ But the policy behind a statute and the statute itself need not be and in this instance are not identical. Often, legislators, to make assurance doubly sure, draft a statute that goes further than the goal they wanted to achieve; they overshoot the mark to make sure they won't undershoot it. This seems to be what happened in 1950 when Congress set about to codify *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 460, 62 S.Ct. 676, 680, 86 L.Ed. 956 (1942), which had held as a matter of federal common law that an agreement that "was designed to deceive the creditors or the public authority or would tend to have that effect" was not enforceable against the FDIC if the result would be to impair the value of its asset. See also *id.* at 472–74, 62 S.Ct. at 686–87 (Jackson, J., concurring). The statute makes the common law principle both more encompassing

and more precise. It requires that the agreement, to be effective against the FDIC, be written, be executed contemporaneously with the acquisition of the asset (in this case the promissory note), be approved by the bank's board of directors or its loan committee, be noted in the bank's minutes, and, continuously from the time of execution, be an official record of the bank. None of these conditions, with the possible exception of the first (if an unexecuted agreement should be treated as written rather than oral), is satisfied in this case. The "certain agreement" that the bank allegedly violated was never executed by the parties to it, was not approved by the bank's board or loan committee, was not noted in the bank's minutes, and was not an official or for that matter any other sort of bank record.

■ Joyce appeals to the concept of incorporation by reference. The promissory note states that a default under the "certain agreement" is a default under the note. Therefore, he argues, the certain agreement—though unexecuted, unapproved, not an official record—was part of the note, which was executed, was duly approved, was part of the bank's official records. The statute contemplates, however, that the FDIC's appraisers can confine their scrutiny to documents found in the bank's official records. Cf. *id.* at 472, 62 S.Ct. at 686 (Jackson, J., concurring). The certain agreement was not among them. If we accepted Joyce's argument, this would imply that when the appraiser came across the promissory note he would have had to conduct an inquiry into the whereabouts, status, and terms of the "certain agreement," mentioned in (but not a part of) the note. Yet even if he located the agreement it might not occur to him to inquire whether the banks had actually supported Joyce's bid, because the agreement does not in terms require such support. Maybe such a requirement is implicit, but this would be apparent only to one who had steeped himself in the negotiations leading up to the drafting of the agreement. The FDIC is not required to

go so far. It can stop considerably shorter. It can ignore any side agreement imposing conditions on the promissory notes that it acquires from troubled banks unless the agreement conforms to the demanding requirements of section 1823(e). *FDIC v. Merchants Nat'l Bank*, 725 F.2d 634, 639 (11th Cir.1984).

*Howell v. Continental Credit Corp.*, 655 F.2d 743 (7th Cir.1981), the principal case on which Joyce relies, is distinguishable, although it does contain language helpful to him—it says that the statute is inapplicable "where the document the FDIC seeks to enforce is one, such as the leases here, which facially manifests *bilateral* obligations and serves as the basis of the lessee's defense." *Id.* at 746 (emphasis in original); see also *id.* at 747. Continental Credit Corporation agreed to purchase certain equipment and lease it back to Mrs. Howell. To raise the cash to buy the equipment, Continental sold its interest in the lease (actually leases, but we can ignore that complication) to a bank that later became insolvent. The FDIC bought the lease from the bank, as it bought Joyce's note in this case. However, Continental had failed to buy most of the equipment it was supposed to lease to Mrs. Howell; it had used the money from the sale of the lease for other purposes. The question was whether the FDIC had acquired the lease subject to Mrs. Howell's defense that her obligations under it were contingent on the lessor's acquiring the equipment. She had deposited with the bank that later went broke $1 million to secure her performance under the lease and apparently the FDIC refused to return the deposit. This court held that the FDIC was bound by the terms of the lease.

It is hard to quarrel with this result. Not only was the lease explicit about the lessor's obligation, see *id.* at 747; not only was it a lease rather than a promissory note (and how, merely by buying the lessor's interest, could the FDIC become a lessor without duties?); but in addition there was no side agreement in *Howell*. The conditions that Mrs. Howell sought to enforce against the FDIC's asset (i.e., the lease) appeared in the asset itself rather than in an agreement merely referred to in the asset. One may doubt whether section 1823(e) had any application—that would be like arguing that the FDIC could ignore the due date in a promissory note it had bought from a troubled bank, and call the loan immediately. Cf. *FDIC v. Panelfab Puerto Rico, Inc.*, 739 F.2d 26, 30 (1st Cir.1984). The fact that there was an interpretive issue in *Howell* could not defeat Mrs. Howell's claim; a written obligation does not become unwritten just because there is a question about its meaning.

The fact that this court in *Howell* articulated its result in language broad enough to cover the present case shows only that courts cannot write readable opinions without using general language. Lesson Number One in the study of law is that general language in an opinion must not be ripped from its context to make a rule far broader than the factual circumstances which called forth the language.

■ Our conclusion that the FDIC took Joyce's note free of any defenses based on the "certain agreement" does not leave him without any remedy. He can pursue his claims against Continental and the other two banks—all three of which now are solvent—in state court. But he cannot withhold from the FDIC the money that he borrowed from Continental, whose note the FDIC acquired. The statute makes the contract that he claims Continental broke unenforceable against the FDIC.

■ The other issues do not require extended discussion. We have mentioned Joyce's effort to show that the FDIC did not really acquire his note. His argument that Continental committed fraud when it promised to support his bid is unavailing against the FDIC, for such a promise would be a side agreement to which section 1823(e) would apply. *FDIC v. Hatmaker*, 756 F.2d 34, 37 (6th Cir.1985). Fraud might be relevant if it were "independent of any understanding or side agreement," *FDIC v. Merchants Nat'l Bank, supra*, 725 F.2d at 639, as in a case where the

borrower is induced to sign a promissory note by an oral misrepresentation that the bank is solvent, and there is no side agreement. *FDIC v. Hatmaker, supra,* 756 F.2d at 37; *Gunter v. Hutcheson,* 674 F.2d 862, 867 (11th Cir.1982); but cf. *FDIC v. Langley,* 792 F.2d 541, 546 (5th Cir.1986). But there was such an agreement in this case. Finally, the district judge's ruling on the amount of attorney's fees was reasonable, and we remind the bar that such a ruling will rarely be disturbed on appeal. For illustrations of this principle in a variety of relevant contexts see *Tomazzoli v. Sheedy,* 804 F.2d 93, 97 (7th Cir.1986) (per curiam); *Wisconsin Real Estate Investment Trust v. Weinstein,* 781 F.2d 589, 597 (7th Cir.1986); *Illinois v. Sangamo Construction Co.,* 657 F.2d 855, 862 (7th Cir. 1981).

AFFIRMED.