**INTEGON LIFE INSURANCE CORPORATION,**
Plaintiff,

v.

**SOUTHMARK HERITAGE RETIREMENT CORPORATION; San Jacinto Savings Association, Defendants.**

No. 91–G–2313–S.

United States District Court, N.D. Alabama, S.D.

Dec. 30, 1992.

---

Andrew P. Campbell, Leitman, Siegal, Payne & Campbell, Birmingham, AL, for plaintiff.

Alton B. Parker, Jr., Deborah A. Pickens, Spain, Gillon, Grooms, Blan & Nettles, Birmingham, AL, for defendants.

## MEMORANDUM OPINION

GUIN, Senior District Judge.

The action before the court is brought to quiet title to outlying parcels of real estate adjacent to the Mount Royal Retirement Center located in Jefferson County, Alabama. Parties to the suit are Integon Life Insurance Corporation and Resolution Trust Corporation, as Receiver for San Jacinto Savings Association, F.A.

In 1985 Mount Royal Towers, Inc., sold the subject property to Southmark Heritage Retirement Corporation [hereinafter Southmark Heritage] for $14,000,000.00, $800,000.00 less than the appraised value of the combined improved and unimproved parcels. Southmark Heritage was owned by Southmark Communities, Inc., which was in turn owned by San Jacinto Savings Association [hereinafter San Jacinto]. San Jacinto was owned by Southmark Corporation [hereinafter Southmark], a registered savings and loan holding company. Southmark functioned as an investment advisor for its subsidiaries.

Integon Life Insurance Corporation [hereinafter Integon Life] is a life insurance company wholly owned by Integon Corporation [hereinafter Integon]. At the end of 1985 Southmark purchased Integon. Thereafter, Integon and Southmark Heritage were affiliated companies, both being subsidiaries of Southmark. The structure of the companies at that time is set forth below:

SOUTHMARK CORPORATION

SOUTHMARK LIFE GROUP, INC.        SAN JACINTO

INTEGON CORP.        SOUTHMARK COMMUNITIES, INC.

INTEGON LIFE        SOUTHMARK HERITAGE

When Southmark purchased Integon in 1985 it laid off the real estate professionals throughout the Integon structure. Subsequently, Robert Dann,[1] Integon staff attorney, functioned as liaison on real estate transactions between Integon and Southmark. William S. Friedman acted in a similar capacity for Southmark. Southmark arranged all of the transactions on behalf of Integon and its subsidiaries.

Mr. Friedman, an attorney, was a controlling shareholder, officer, and director of Southmark. As vice president of Southmark he controlled all of the subsidiaries including San Jacinto, Integon Life, and Southmark Heritage. Mr. Friedman was also a general partner of Southmark Partners I, Ltd.,[2] the limited partnership which was the general partner of Mount Royal Associates Limited Partnership [hereinafter Mount Royal Associates] which bought Mount Royal Towers from Integon Life.

San Jacinto was a first tier subsidiary of Southmark. It was engaged in the syndication of commercial real estate such as Mount Royal to limited partnerships sponsored by its parent, Southmark. San Jacinto provided the financing for these ventures on a long-term basis through purchase money mortgages through limited partnerships. It then showed these mortgages as assets at a valuation at or near the face amount of the mortgages. In 1985 both the SEC and the Federal Home Loan Bank Board attacked these long term financing arrangements contending that San Jacinto was over-valuing its assets.

In early 1986 David Bradley, supervisory agent for the Federal Home Loan Banking Board [hereinafter FHLB],[3] negotiated and entered into an Interim Operating Agreement [hereinafter the Agreement][4] on behalf of San Jacinto with the Federal Savings and Loan Insurance Corporation [hereinafter FSLIC] that San Jacinto would cease providing financing to syndications sponsored by affiliates of its holding company, Southmark Corporation. The Agreement further required San Jacinto to immediately reduce its investment in real estate.[5] The Agreement, however, allowed San Jacinto to sell real estate to a holding company affiliate for cash for the greater of book value in the property or its appraised value. The agreement provided the following:

3. The restrictions in paragraph 2 of this Agreement do not apply to the following:

.    .    .    .    .

(c) the sale by San Jacinto of investments in real estate to any holding company affiliate for cash (with no financing provided by San Jacinto) at the greater of the Association's book value or carrying cost and the appraised value of the property.

Pursuant to the Agreement to reduce its real estate holdings San Jacinto/Southmark Heritage sold the Mount Royal property to Integon Life for $18,209,000.00 [6]

1. Mr. Dann was not involved in the negotiations or in the development of closing documentation for the Southmark Heritage/Integon Life transaction.

2. The other general partners were Gene E. Phillips and John W. Galston. Mr. Phillips, along with Mr. Friedman, was a controlling shareholder, officer and director of Southmark.

3. Mr. Bradley was the supervising agent for San Jacinto from September 1985 through September 1987. He is now Deputy Director of the Dallas Branch of the Office of Thrift Supervision.

4. The Operating Agreement was required by the FHLB. Because of San Jacinto's growth explosion resulting from its transactions with Southmark the FHLB was concerned about the potential conflicts of interest between San Jacinto and affiliates of Southmark Corporation. It was also concerned that San Jacinto's transactions were not arm's length ones.

5. This requirement would make San Jacinto's assets more typical of a savings and loan institution.

6. The cash price paid by Integon for the property reflected a profit of almost $2.9 million dollars to San Jacinto.

cash [7] in October 1986, executing a deed to Integon Life on October 31, 1986.[8] Although both Integon Life and San Jacinto were affiliates of Southmark, the cash sale was more than either the book value of $15,257,911.00,[9] or the appraised value of $14,800,000.00.[10]

Ownership activities at Mount Royal were exempted from the Agreement by the following language:

> 4. The restrictions of subsections (a), (b), and (c) of paragraph 2 of this Agreement shall not apply to the activities in the ordinary course of business of the specified subsidiaries:
>
> .    :    .    .    .
>
> (d) The nursing home management and ownership activities of Institutional Management Services, Mount Royal, Southmark Heritage–Texas and Southmark Heritage–Louisiana.

Integon Life contemporaneously thereafter sold to Mount Royal Towers Limited Partnership Parcels A and E for $5,000,-000.00 cash plus a note for $15,000,000.00 to be paid over eleven years.[11] Unfortunately, Integon Life never realized the profit of its sale. The limited partnership failed and defaulted on the mortgage, owing Integon Life over $12,500,000.00.[12]

Integon Life did not convey parcels B, C, D, F, G and H. In an effort to recoup some of its losses it is now seeking to sell the unimproved parcels of the Mount Royal property to MFW for $425,000.00. A title search subsequent to the MFW contract revealed the original deed was not recorded. Evidence shows the deed has been lost. In an effort to clear title Integon Life approached San Jacinto for a replacement deed. At that point Resolution Trust Corporation [hereinafter RTC] adopted the position that the property was a "found asset," that San Jacinto sold only Parcels A and E [13] to Integon Life and kept title to Parcels B, C, D, F, G and H. As Receiver for San Jacinto Savings Association, F.A., RTC now claims title to those parcels.

■ Integon Life, claiming sole ownership of the property, has brought suit to quiet title [14] to those parcels of property pursuant to Ala.Code § 6–6–560 *et seq.* (1975), pertinent portions of which are set forth below:

> When any person, natural or artificial, claims either in his own right or in any representative capacity whatsoever, to own any lands or any interest therein, and is in actual peaceable possession of the land ... *or* if he, together with those through whom he claims, has held color of title and paid taxes on the land or interest so claimed during the whole of such period of time, ... he may ... file a verified complaint ... to establish the right or title to such lands or interest and to clear up all doubts or disputes concerning the same. (Emphasis added.)

In order to quiet title to the subject property the court must examine the 1986 sale of the Mount Royal property to Integon Life. The sales contract, executed September 15, 1986, by William S. Friedman on behalf of Southmark Heritage, contained the legal description of Parcel A, the parcel containing the Mount Royal Towers Retire-

---

7. This cash sale prevented it from being a prohibited sale under the Agreement.

8. The actual closing was December 16, 1986, with an effective date of October 31, 1986.

9. RTC claims San Jacinto's true investment in the property was $18,200,000.00. Mr. Dann testified Southmark Heritage had invested more than $3,000,000.00 in carrying costs.

10. The McGolgan & Company appraisal valued all of the property, approximately "34.14" acres, for $14,800,000.00. Included within the appraised value of the property was a separate appraised value of $580,000.00 for Parcels B, C, D, F, G and H, the unimproved parcels of land.

11. The paper profit was attributable to the risk Integon took by financing 75 per cent of the sales price.

12. By agreement Integon Life has not foreclosed on the property but has allowed the partnership to pay on the note at a lower rate.

13. The improvements are located on Parcel A. Parcel E describes land over which a right of way is conveyed to provide access to Parcel A.

14. The suit to quiet title assumes the absence of a deed—the very question in the case at bar.

ment Center, and Parcel E. Mr. Friedman testified by deposition that it was the intention of Southmark Heritage, however, to convey everything acquired from Mount Royal Towers, Inc. That "included both the developed parcels and whatever other adjacent or pertinent land we had."

The court finds credence in Mr. Friedman's testimony. The San Jacinto records reflect the sale of the property. Larry Romero, account officer with San Jacinto Savings Association, F.A., testified that San Jacinto as a corporation knowingly recognized "all" the parcels had been sold. It intended to convey all of the property, considered that it had conveyed all the property, and accepted the appraised price for the entire property. Following the sale San Jacinto/Southmark Heritage failed to list the property as an asset, failed to exercise any incidents of ownership or possession over it, failed to maintain insurance on it, and failed to pay property taxes.

RTC has tried to convince the court that Southmark's lump sum payment of property taxes covered payment of taxes on the subject property on behalf of Southmark Heritage. The evidence indicates that Integon Life, not Southmark Heritage, either paid directly or was charged through Southmark's real estate accounting methods all real estate *ad valorem* taxes for 1987, 1988, 1989, 1990, and 1991. The San Jacinto structure did not pay taxes on the conveyed property and had no intention of doing so.

The sale was approved pursuant to the contract by certified resolution of the corporation. The court has rejected RTC's argument that the contract language reflected the intent of the parties to transfer parcels A and E only. By its subsequent actions of accepting the benefits of the full purchase price and failing to repudiate any discrepancies between the contract and deed, the Southmark Heritage Board of Directors ratified the transaction. As a director and secretary of the corporation Mr. Friedman reflected thorough knowledge and acquiescence on the part of the directors. The court addressed a similar issue in *Ingalls Iron Works Company v. Ingalls*, 177 F.Supp. 151, 163 (N.D.Ala. 1959) *aff'd* 280 F.2d 423 (5th Cir.1960), when it said in part:

"The law imputes to a corporation knowledge of facts which its directors ought to know, in the exercise of ordinary diligence in the discharge of their official duties, when the imputation of such knowledge to the corporation is necessary to protect the rights of third persons. The directors are presumed to know that which it is their duty to know and which they have the means of knowing. 3 Thompson on Corporations (3rd Ed.) § 1783." (Quoting *Seymour Improvement Co. v. Viking Sprinkler Co.*, 87 Ind.App. 179, 161 N.E. 389, 401).

.    .    .    .    .

Furthermore, it is the Court's opinion ... that the knowledge acquired by the attorneys for The Ingalls Iron Works Company, Mr. Strickland, its general counsel, and Mr. Greer and Mr. Deramus, who represented the corporation in both of these Civil Actions, that Robert I. Ingalls, Jr., as chief·executive officer of the corporation, had purported in its behalf, by the execution of the written instrument on March 10th, to make a binding contract of settlement for the company, was imputable to the corporation, regardless of the knowledge actually acquired by the directors, placing upon the corporation, through its directors or otherwise, the duty to affirm the contract within a reasonable time, which the corporation did not do. *The general rule ·that knowledge acquired by an agent in the course of his agency and employment is imputable to the principal as a matter of law, is applicable to knowledge acquired by an attorney; Waters v. American Cas. Co. of Reading, Pa.*, 261 Ala. 252, 73 So.2d 524 (Headnote 22).... While it has been held that knowledge of the president of a corporation who has signed a contract without authority of the directors, is not knowledge on the part of the corporation where the other stockholders and directors have no actual knowledge of it (Fletcher, Volume 2 § 759, page 1089), *there is strong au-*

*thority for the proposition that the knowledge, in the absence of fraud, of an officer or agent who did not make the unauthorized contract, but who acquired knowledge of the fact of its execution or making, in the course of his employment, is imputable to the principal as a matter of law....*

The Court is of the opinion that ... the contract is binding upon the corporation because of the failure of the corporation, or its directors, *to disaffirm it within a reasonable time* (emphasis added).

*See also American Standard ·Credit, Inc. v. National Cement, Inc.*, 643 F.2d 248, 270 n. 16 (5th Cir.1981) (" '[T]he general rule is well established that a corporation is charged with constructive knowledge, regardless of its actual knowledge, of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of his employment within the scope of his authority, even though the officer or agent does not in fact communicate his knowledge to the corporation.' ") (quoting from 3 W. Fletcher, Cyclopedia of the Law of Private Corporations § 790, at 12 (rev. perm. ed. 1975)); *Georgia Casualty Company v. Massey*, 201 Ala. 601, 79 So. 33 (1918) (Even unauthorized act of agent will bind corporation if the act be subsequently ratified expressly or by acquiescence or by failure to repudiate the act known to have been done.).

On December 8, 1986, prior to the consummation of the Southmark Heritage/Integon Life sale, Mr. Robert Bartell, Jr., Chairman of the Board of San Jacinto, submitted a letter [15] and application [16] for approval of the transaction by the Federal Home Loan Bank of Dallas to Mr. Bradley as its supervisory agent. The application purported to sell all of the assets of Southmark Heritage. Pertinent language reads as follows:

> The transaction contemplates the purchase of real property known as Mount Royal Towers Retirement Center, which real property constitutes **all** of the assets of Southmark Heritage .Retirement Corporation, the Applicant's wholly owned subsidiary corporation, by Integon Life Insurance Company, a wholly owned subsidiary of Southmark Corporation, the Applicant's parent. Consideration will be cash at closing. Approval of the transaction is required under Section 584.3(a)(7)(i) (emphasis added).

The application did not disclose Integon Life's proposed sale of Parcels A and E to Mount Royal Associates and the syndication of the property. Such disclosure, however, was not a part of or a requirement of the Agreement.

▪ By letter of December 31, 1986, Mr. Bradley informed Mr. Bartell the application "was reviewed in accordance with the regulations and with the Interim Operating Agreement" and had been approved. Pertinent language of the letter reads as follows:

> Since this transaction will allow San Jacinto to reduce its direct investment in real estate and recognize a substantial

---

**15.** The submission of the letter and its accompanying application by San Jacinto's CEO further evidences corporate knowledge of the sale of all the property. Under Alabama law the corporation is charged with his knowledge.

The substance of the letter follows:

Enclosed please find application for approval of a transaction with an affiliate in conjunction with the Association's disposition of the Mount Royal Towers Retirement Center located in Birmingham, Alabama. The proposed sale will be to Integon Life Insurance Company, an affiliated Southmark company and will result in a profit to the Association of approximately $3 million. The entire purchase price to be paid to San Jacinto will be in the form of cash at closing. Additional information on the sale transaction is provided in the attached memorandum from Kurt Swenson, our Senior Vice President, Real Estate Division. Since this sale is critical to our compliance with the Interim Operating Agreement at December 31, 1986 and since the anticipated closing is December 15, 1986, an early response would be appreciated.

**16.** Application H–(d)2 to the FSLIC read: "Application by a Subsidiary Insured Institution ("Applicant") of a Savings and Loan Holding Company for Approval of Certain Transactions with Affiliates under Section 408(d)(6) of the National Housing Act, As Amended, and Section 584.3(a)(7) of the Regulations for Savings and Loan Holding Companies."

profit, we take no objection to the transaction as described in your letter of December 8, 1986.

Submission of the application and its approval were, however, not requirements pursuant to the Agreement. The court finds nothing in the evidence requiring FHLB approval of the Southmark Heritage/Integon Life cash sale. Southmark Heritage was obligated to sell the property for the appraised or book value. Integon Life was not obligated to tell what it planned to do with the purchased property.[17] It is irrelevant that Mr. Bradley testified he would not have approved the sale had he known Integon Life planned to sell "the property" for a profit or to a Southmark affiliate of which Messrs. Phillips and Friedman were general partners of the limited partnership which was the general partner of Mount Royal Associates, purchaser of Mount Royal Towers. His approval was not necessary. Furthermore, RTC is not contesting the sale of Parcels A and E. This is a suit to quiet title to Parcels B, C, D, F, G, and H, the unimproved parcels. Integon Life had no plans to sell those parcels at the time it made application to the FHLB. It has not to this day made a profit on their sale.

The court finds that FHLB approval for the Southmark Heritage/Integon Life cash sale was not a condition precedent.

Mr. Friedman executed the general warranty deed as vice president of Southmark Heritage and accepted delivery of the deed on behalf of Integon Life.[18] Not only did he execute and accept delivery of the deed, he testified he intended to transfer title. *Boohaker v. Brashier*, 428 So.2d 627, 629 (Ala.1983) (There must be a clear manifestation of intent to deliver; the question of delivery rests on the intention of the grant-

or, which is to be determined from all the attendant circumstances at the time.); *Johnson v. Bridges*, 333 So.2d 813, 815 (Ala.1976) ("*Whenever there is a clear manifestation of the intention of the grantor in a deed, in all other respects properly executed, to part with the possession and dominion of it, and to transfer it to the grantor [sic, grantee], the delivery is complete.*") (Quoting *Gulf Red Cedar Co. v. Crenshaw et al.*, 169 Ala. 606, 53 So. 812 (1910).

The notarized deed, prepared in the law office of Mr. Friedman by Anthony J. Russo, conveyed parcels A, B, C, D, E, F, G, and H. The description of the property as listed in the deed is consistent with the description contained in the bill of sale executed by Mr. Friedman. Mr. Friedman's law firm was to record the deed. It failed to do so. Even so, both Integon Life and San Jacinto have identical copies of the deed conveying A, B, C, D, E, F, G, and H in their records,[19] further indication that this was the contemplated transfer. Both William Friedman and Bobby Dann testified that the copy of the deed entered into evidence was an identical copy of the original deed.[20] They testified further that it was the clear intent of Southmark Heritage to convey all parcels to Integon Life. Having been ordered to divest itself of its real estate holdings, Southmark Heritage would have had no reason to retain title to unimproved property from which it received no income.

Following the transfer of the property, Integon Life then directed a separate deed conveying the two parcels, A and E, to be sold to Mount Royal Associates to be prepared. This directive would be in keeping

---

**17.** RTC has argued that the FHLB was misled by the application because it did not state that Integon Life intended to sell the property to Mount Royal Towers Associates, a Southmark sponsored limited partnership.

**18.** As director and secretary of the corporation Mr. Friedman clearly had authority to execute the deeds on behalf of the corporation and its board of directors.

**19.** Integon Life's original copy of the deed is attached to its closing document entered into the record as Plaintiff's Exhibit 1.

**20.** Fed.R.Evid. 1004(1) provides that a duplicate of a writing, recording or photograph is admissible if the original has been lost or destroyed. RTC made no objection to the entry of plaintiff's copy of the deed or the one produced by RTC during discovery.

with its intent to sell the improved property and hold the unimproved property.

It is not surprising that Mr. Friedman's law firm failed to record the deed. It is not surprising that the deed was lost. It is not surprising that the wrong description was used on the contract of sale. The case reeks of lawyer carelessness. The evidence indicates three sets of deeds were prepared in accordance with differing contemplated ways in which to handle the sales. In the confusion a deed conveying Parcels A and E directly to Mount Royal Towers Limited Partnership from Southmark Heritage was recorded. Parcels A and E were transferred twice to different transferees. That problem, however, is not before the court.

■■■ The court rejects RTC's argument that the *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), doctrine, codified at 12 U.S.C. § 1823(e) (1976),[21] applies. In *Federal Deposit Insurance Corporation v. Merchants National Bank of Mobile*, 725 F.2d 634, 637 (11th Cir.1984), the court held that the district court "correctly applied Sec. 1823(e) to exclude as irrelevant any evidence not found in the records." The purpose of section 1823(e) is to protect the FDIC from hidden agreements that would prevent the FDIC from accurately evaluating assets and from making informed decisions. *Federal Deposit Insurance Corporation v. Hatmaker*, 756 F.2d 34, 37 (6th Cir.1985). The special protections afforded by section 1823(e) allow the receiver to rely on the books and records of the institution. *Federal Deposit Insurance Corporation v. Merchants National Bank of Mobile*, 725 F.2d at 638.

■■■ The section does not apply to every inquiry concerning an asset. The statute "does not apply when ... the parties contend that no asset exists ... and that

such invalidity is caused by acts independent of any understanding or side agreement." *Commerce Federal Savings Bank v. Federal Deposit Insurance Corp.*, 872 F.2d 1240, 1245 (6th Cir.1989) (quoting *Merchants Nat'l Bank of Mobile*, 725 F.2d at 639). The subject property was not listed as an asset in the San Jacinto/Southmark Heritage records after December 31, 1986, let alone at the time RTC took over as receiver. The absence of the listing of the subject property as an asset precludes RTC from claiming the property. The property was not listed "continuously, ... [as] an official record" of San Jacinto/Southmark Heritage because Southmark had sold it to Integon Life. Since it had been sold RTC did not acquire the property as part of San Jacinto's assets. *See Federal Deposit Insurance Corporation v. Nemecek*, 641 F.Supp. 740 (D.Kan.1986) (Court held that when FDIC purchased the bank's assets it could not have purchased the defendants' note which had been previously extinguished.).

From the evidence before the court Integon Life has established the elements to quiet title. The Alabama Supreme Court has held that an action to quiet title "will lie in two fundamental situations, one is where the complainant is in the actual peaceable possession of the property, and the other is whether [sic] no one is in the actual possession of the property." *Penney v. Carden*, 356 So.2d 1188, 1189 (Ala. 1978). Integon Life is in actual peaceable possession of the property. It has paid all of the property taxes since 1986; it has disclosed the transaction on its sworn financial statements filed with departments of insurance throughout the United States; it has maintained insurance coverage on the property; and it has represented to a class of investors that it had purchased the property. Integon Life was the only party

---

**21.** "No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depos-

itory institution, shall be valid against the Corporation unless such agreement—

    .    .    .    .

(4) **has been, continuously, from the time of its execution, an official record of the depository institution**" (emphasis added).

claiming the property up until RTC became involved.

The court holds that title to parcels B, C, D, F, G, and H vested in Integon Life pursuant to the lost deed. Evidence indicates Southmark Heritage intended to sell and Integon Life intended to purchase all of the subject property. The court accepts the copy[22] of the deed entered into the record in lieu of the lost original deed which was not recorded. The duplicate establishes that Southmark Heritage conveyed parcels B, C, D, F, G, and H to Integon Life.

In the alternative, the court finds that Integon Life has satisfied the requirements of proving a prima facie case of ownership of parcels B, C, D, F, G, and H pursuant to the Alabama statute to quiet title and its interpretations by the Alabama courts.

For the reasons set forth above the court holds that title to parcels B, C, D, F, G, and H rests in Integon Life. An order consistent with this opinion is being entered contemporaneously herewith.

DONE and ORDERED.

## FINAL ORDER

This cause came before the court sitting without a jury on October 19, 1992, in an action to quiet title to the property surrounding the Mount Royal Retirement Center on Royal Tower Drive in Birmingham, Alabama. Having considered the evidence presented at trial, the extensive briefs supplied by counsel, and the applicable law, the court is of the opinion that title to Parcels B, C, D, F, G, and H lies in Integon Life Insurance Corporation. Accordingly, consistent with the memorandum opinion being entered contemporaneously herewith, it is

ORDERED, ADJUDGED, DECREED and DECLARED that title to Parcels B, C, D, F, G, and H, the unimproved land surrounding and adjacent to Parcel A on which the Mount Royal Retirement Center on Royal Tower Drive in Birmingham, Ala-

bama, is situated, rests in Integon Life Insurance Company. It is

FURTHER ORDERED, ADJUDGED, DECREED and DECLARED that Integon Life Insurance Company has exclusive, undivided title in said property in fee simple absolute. It is

FURTHER ORDERED, ADJUDGED, DECREED and DECLARED that no other party or entity, including the defendants to the above-styled action, have any right of ownership or title or interest in subject property.

All outstanding motions are MOOTED by entry of this order.

DONE and ORDERED.

---

22. RTC made no objection to the deed's admissibility at trial. The plaintiff's copy of the deed was properly admitted into evidence pursuant to Fed.R.Evid. 1003 and Fed.R.Evid. 1004(1).